Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/12/2019 09:08 AM CDT

Ashley Welch, appellee, v.
Preston Peery, appellant.
___ N.W.2d ___

Filed March 5, 2019.    No. A-18-236.

1. **Child Custody: Visitation: Child Support: Appeal and Error.** Child custody, visitation, and child support determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system.

3. **Contempt: Appeal and Error.** In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which the trial court's (1) resolution of issues of law is reviewed de novo, (2) factual findings are reviewed for clear error, and (3) determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion.

4. **Child Custody.** In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her.

5. ____. Both the desire to form a new family unit through remarriage and the career advancement of the parent have been found to constitute legitimate reasons for leaving the state.

6. **Child Custody: Visitation.** The court examines three broad considerations in determining whether removal to another jurisdiction is in a

child's best interests: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation arrangements.

7. **Child Custody.** The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party.

8. ____. In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent.

9. ____. The list of factors to be considered in determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children should not be misconstrued as setting out a hierarchy of factors.

10. **Child Custody: Visitation.** Consideration of the impact of removal of children to another jurisdiction on the contact between the children and the noncustodial parent, when viewed in light of reasonable visitation arrangements, focuses on the ability of the court to fashion a reasonable visitation schedule that will allow the noncustodial parent to maintain a meaningful parent-child relationship.

11. ____: ____. Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent.

12. **Modification of Decree: Child Custody: Notice.** A trial court has no authority to modify a prior custody order without notice to the parties and an opportunity to be heard.

13. **Modification of Decree: Child Support.** Among the factors to be considered when contemplating a modification of child support are the changes in the financial position of the parent obligated to pay support,

the needs of the children for whom support is paid, the good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent.

14. **Jurisdiction: Appeal and Error.** Notwithstanding whether the parties raise the issue of jurisdiction, an appellate court has a duty to raise and determine the issue of jurisdiction sua sponte.

15. **Jurisdiction: Final Orders: Appeal and Error.** For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken.

16. **Final Orders.** Final orders must be signed by the judge as well as file stamped and dated by the clerk.

17. **Jurisdiction: Judgments: Appeal and Error.** Neb. Rev. Stat. § 25-1912(2) (Reissue 2016) creates what the appellate courts have called potential jurisdiction or springing jurisdiction, wherein an announced decision creates a situation where the appellate court potentially has jurisdiction that will spring into existence when the announced decision is properly rendered and entered.

18. **Pleadings: Judgments.** If a postjudgment motion seeks a substantive alteration of the judgment—as opposed to the correction of clerical errors or relief wholly collateral to the judgment—a court may treat the motion as one to alter or amend the judgment.

Appeal from the District Court for Lancaster County: Lori A. Maret, Judge. Affirmed in part, affirmed in part as modified, reversed in part, and in part dismissed.

Adam R. Little, of Ballew Hazen, P.C., L.L.O., for appellant.

No appearance for appellee.

Pirtle, Bishop, and Arterburn, Judges.

Arterburn, Judge.

## I. INTRODUCTION

Preston Peery (Preston) appeals from an order of the district court for Lancaster County which granted the request of Ashley Welch (Ashley) to remove the parties' minor child, Payton P., from Nebraska to Florida. On appeal, Preston challenges the district court's decision to allow Ashley to move Payton to Florida. In addition, he challenges the court's decisions to

grant Ashley sole legal custody of Payton, to not modify the prior child support order, and to not find Ashley in contempt of a court order. For the reasons set forth herein, we affirm the decision of the district court with regard to removal of Payton to Florida and child support. However, we reverse the court's decision regarding legal custody of Payton and we modify the amount of parenting time awarded to Preston in the parenting plan. We do not have jurisdiction to consider Preston's contempt action against Ashley.

## II. BACKGROUND

Preston and Ashley are the biological parents of Payton, a daughter born out of wedlock in May 2008. In April 2014, when Payton was almost 6 years old, a hearing was held where the district court approved a stipulated paternity order and parenting plan. Pursuant to the parties' joint stipulation and parenting plan, they shared joint legal custody of Payton. Ashley was awarded sole physical custody of Payton, and Preston was awarded liberal parenting time. Such parenting time included every other weekend from 5 p.m. on Thursday to Monday morning and every Tuesday from 5 p.m. to Wednesday morning. In addition, the parties divided up Payton's summer vacation from school such that Payton resided with Preston every other week for the first 10 weeks of the vacation. As a part of the parenting plan, Preston agreed to pay child support to Ashley in the amount of $150 per month.

On March 30, 2017, when Payton was almost 9 years old, Ashley filed a complaint to modify the paternity order and parenting plan. In her complaint, Ashley requested that she be permitted to move to Florida with Payton. Ashley asserted that she had a legitimate reason for wanting to move and that the move would be in Payton's best interests. On April 28, Preston filed an answer to Ashley's complaint to modify. He opposed Ashley's request to move to Florida with Payton.

Prior to the hearing on Ashley's complaint to modify, Preston filed a motion asking the court to find Ashley in

contempt. Preston alleged that Ashley had already moved to Florida with Payton in violation of the original paternity order and parenting plan. Preston indicated that he had evidence that Ashley had registered Payton for school in Florida. The district court entered an ex parte order requiring Ashley to return with Payton to Nebraska. A hearing was scheduled to address Preston's motion for contempt for August 7, 2017.

At the hearing on the motion for contempt, Ashley testified that she had returned to Nebraska from Florida the week before so that Payton could start school on August 14, 2017. She explained that she and Payton had not yet moved to Florida, but that they had spent the summer there, visiting Ashley's father and spending time with Ashley's fiance, Justin Abbott (Justin), who had already moved to Florida to accept a job. Ashley testified that she always intended for Payton to return to Nebraska to start school in August. At the time of the contempt hearing, Ashley and Payton were residing with Ashley's sister, because Ashley's previous home in Nebraska was being sold by Ashley's parents, who owned the home.

Ashley explained that her decision to spend the summer in Florida with Payton did not affect Preston's parenting time because Preston was otherwise unable to be present for visits as he had been incarcerated since January 4, 2017. Ashley testified that Preston was aware they were spending time in Florida.

After the hearing, the district court found, "Based on the evidence presented here today, I do not find by clear and convincing evidence that [Ashley] is in willful contempt of the Court . . . ." The court dismissed Preston's contempt action.

A hearing was held on Ashley's complaint to modify on November 1, 2017. At the hearing, both Ashley and Preston testified. In addition, Ashley's father testified on her behalf and Preston's father testified on his behalf.

At the modification hearing, Ashley testified that she had moved to Florida in order to accept an employment opportunity which began on September 5, 2017. Payton was currently

residing in Nebraska with Ashley's sister and attending a "good" school nearby. Ashley indicated that Payton is excelling at her current school. However, Ashley testified that the school Payton would attend in Florida is also a good school with experienced teachers, many extracurricular activities, and relatively new facilities. Ashley testified she has returned to Nebraska to see Payton one time per month since she moved to Florida.

In Florida, Ashley is living at her father's home with her father, her stepmother, and Justin. Also living in the home are the two children Ashley and Justin share. At the time of the hearing, the oldest of these children was 4 years old and the youngest of the children was less than 1 month old. Ashley testified that she and Justin had been in a relationship "off and on" for nearly 6 years. They planned to get married sometime in 2018. Ashley admitted that she and Justin had been involved in an incident of domestic violence in 2013. She explained that both she and Justin had been drinking alcohol and had argued. Justin became angry and hit her with an open hand across her face. Ashley testified that Payton was not present at the time. Since that incident, Justin has gone through counseling. Ashley testified that "he doesn't have a temper anymore." She described Justin as a good provider who enjoys spending time with his family. In addition, Ashley testified that Payton and Justin have a good relationship.

Ashley also testified that the house in Florida was appropriate for Payton. The home was newly remodeled and was nicer than the home where she and Payton had lived in Nebraska. The home also included a great deal of outdoor space and had a number of activities to engage in nearby. Ashley and Justin had an arrangement with Ashley's father that they would not have to pay rent, but would assist financially with some of the utility payments. Ashley testified that eventually, she and Justin planned to acquire their own house in Florida.

Ashley testified that she has been employed as a licensed practical nurse for the past 10 years. Prior to moving to

Florida, Ashley was employed at Madonna Rehabilitation Hospital (Madonna) in Lincoln, Nebraska. As a part of her job, Ashley typically worked night shifts and sometimes had to work on weekends and on holidays. Her schedule changed often, which made it difficult to parent her young children. Ashley left her job at Madonna in May 2017, because she was pregnant, Justin was making enough money to support the family for a while, and she wanted to spend the summer in Florida. She testified that she did look for other nursing jobs in Nebraska, but did not find anything workable or better than her job at Madonna.

Ashley accepted a new job in September 2017. She became the care coordinator for a medical clinic in Florida. At the new job, she works Monday through Friday and has "[f]lexible hours." She does not have to work nights, weekends, or holidays. In addition, she earns a slightly higher salary (from $18.90 per hour at Madonna to $22 per hour at the clinic in Florida). Ashley testified that the total economic benefit for her and Justin to move to Florida is $16,640 per year plus Justin's commissions. Ashley's new job also offers better opportunities for advancement than her job at Madonna.

Ashley acknowledged that the move to Florida would have an effect on Preston's relationship with Payton. Ashley indicated that prior to Preston's incarceration, the original parenting plan was working. Preston regularly attended parenting time with Payton. In fact, Preston sometimes watched Ashley's middle child as well. Ashley testified that she has always encouraged Payton to go to Preston's parenting time. Ashley testified that she knows that Preston loves Payton and that Payton loves Preston. However, she did indicate that, currently, Payton is upset with Preston as a result of his incarceration.

Ashley did testify about her concerns regarding Preston's parenting. Ashley noted that Preston's most recent incarceration was his third period of incarceration during Payton's lifetime. During the most recent incarceration, Payton has

not been able to see Preston for a significant period of time because he was housed at a work ethic camp in McCook, Nebraska. The last time Preston was able to speak with Payton on the telephone was July 2017, approximately 4 months prior to the modification hearing. In addition, Ashley testified that Preston has a problem with both alcohol and illegal drugs. She referred to Preston as a "severe alcoholic" who drinks every day. She also testified that Preston regularly used cocaine when they were in a relationship.

Ashley testified about incidents that have caused a strain in her relationship with Preston. She described an incident prior to Preston's incarceration when he failed to return Payton after his scheduled parenting time. Instead, he filed a protection order against Ashley, claiming that she had threatened him with a knife and that she had attacked him. Ashley testified that these allegations were false. In another incident, Preston "called CPS on Justin claiming that he punched [Payton] in her face." According to Ashley, this allegation was also false. Finally, Ashley indicated that in March 2017, when she first told Preston about her plan to move to Florida, he threatened to take custody from her and to delay the court proceedings until she "r[a]n out of money." In addition, Ashley testified that Preston offered her $10,000 if she would give him full custody of Payton.

Ashley indicated that Preston has not consistently paid child support to her. In 2015, Preston paid her approximately $1,000, instead of the $1,800 that was court ordered. In 2016, Ashley received only $800 in child support payments. In 2017, Ashley did not receive any child support payments because of Preston's incarceration. Ashley testified that Preston's failure to consistently pay his child support obligation caused her financial strain, which ultimately necessitated her seeking out better employment.

Ashley proposed a parenting plan if she was permitted to move to Florida with Payton. In the proposed plan, she would receive sole legal and physical custody of Payton and Preston

would receive 6 weeks of parenting time each summer. In addition, he would receive 2 weeks of parenting time every other Christmas. Ashley testified that Preston could also have parenting time with Payton during the Thanksgiving holiday on years he did not see her for Christmas. However, in the proposed parenting plan she submitted to the district court, Ashley did not mention the Thanksgiving holiday parenting time.

Ashley told the district court that she was willing to forgo receiving any child support from Preston so that he would have additional funds to pay for travel expenses. Ashley testified that in addition to the scheduled parenting time, she was willing to facilitate both telephone conversations and "Skype" conversations between Preston and Payton. Ashley also indicated that because she has extended family in Nebraska, including her mother, her sister, and her stepmother's family, she would probably return to Nebraska three times per year. During those visits, she was willing to provide Preston parenting time with Payton. Ashley also indicated that because Payton is particularly close to Preston's other two children, it would be possible for them to visit Payton in Florida. Ashley stated that if her request to move to Florida with Payton is denied, she will return to Nebraska.

Finally, Ashley testified that during a previous court case involving Preston, she lied to the court. In 2009, Ashley filed a request for a protection order against Preston. In her request, she indicated that Preston had assaulted her. However, shortly after filing her request, she filed a retraction. Ashley testified at the modification hearing that the statements she made in her retraction were not truthful. She explained, "[H]e apologized, and, like an idiot, I always returned. I did that for six and a half years with him . . . ." Ashley testified that the truth was that during her relationship with Preston, he was manipulative, violent, and verbally demeaning. She admitted that she was very immature during the relationship.

Preston also testified at the modification hearing. Preston testified that at the time of the hearing, he remained incarcerated.

He had been placed at a community corrections center in Lincoln for the 2 months prior to the hearing. Before that, he was placed at the work ethic camp in McCook. Preston did not specifically indicate when he expected to be released from prison.

Preston testified that his current incarceration was the result of his convictions for perjury and possession of a controlled substance. There was evidence that Preston's possession conviction was the result of him "planting" cocaine in a car owned by the mother of one of his other children with whom he was involved in a custody dispute. Previously, he has been convicted of a probation violation, possession of a stolen firearm, and, on three different occasions, driving under the influence. His driving privileges have been revoked for 15 years.

Preston testified that he is "currently" employed at a business as a sales manager, project manager, and finance manager. He indicated that he has been employed in this capacity for the last 2 years and earns only the minimum wage. It is not clear whether Preston was testifying about his employment prior to his incarceration, whether he was allowed out of the community corrections center to work during the day, or if Preston will have this job after his release. Preston did testify that he has provided financial support to Payton since her birth. He admitted that in the past, he has paid less than the court-ordered amount of child support to Ashley, but he explained that she has always agreed to the reductions.

Preston testified that prior to his incarceration, the original parenting plan was "working perfectly fine." He saw Payton four or five times per week. Preston noted that at the time Ashley agreed to the parenting plan, he already had a criminal history and she had previously accused him of domestic violence. Yet, she still allowed him to spend time with Payton 12 nights per month. Preston testified that since his incarceration, he has not been able to exercise any of his parenting time with Payton. He indicated that he has tried to set up visits, but Ashley has not permitted him to see Payton.

Preston indicated that he is opposing the move to Florida in order to preserve his relationship with Payton. Although he believes the current arrangement is working "fine," he believes that if Ashley moves to Florida, Payton would be better off in Nebraska in his custody. Preston testified that "[a]ll of [Payton's] family" lives in Nebraska. Preston admitted that he offered to pay Ashley $10,000 if she would stay in Nebraska with Payton. Preston testified that if Payton moves to Florida with Ashley, he will not have a relationship with Payton. He indicated his concern that Ashley will not follow the court's orders regarding whatever parenting time he is permitted.

Preston testified regarding his concerns with Ashley's parenting. Preston spent a great deal of his testimony describing his belief that Ashley was a liar. He indicated his belief that a "[m]ajority" of her testimony at the modification hearing was a lie. Specifically, he indicated that she lied about him being abusive to her during their relationship. Preston testified that, in fact, Ashley was the one who was abusive "[a]t times." He also indicated that Ashley lied when she testified that he was an alcoholic and a drug user. He denied having a problem with alcohol or with drugs. He admitted to using cocaine a total of 15 times during his lifetime, but testified that he never had an addiction problem. Preston indicated that Ashley downplayed the seriousness of the domestic violence incident involving Justin. Preston testified that Ashley told him that Justin was repeatedly physically abusive toward her. Finally, Preston testified that he "doubt[ed]" whether Ashley actually had a new job in Florida because she failed to provide him any documentation about this job during the discovery process.

Preston requested that if Ashley is permitted to move to Florida with Payton, he be permitted to see Payton in Nebraska every other weekend. Preston also requested that his child support be modified.

As we noted above, both Ashley's father and Preston's father also testified at the modification hearing. Ashley's father generally corroborated Ashley's testimony about her living

situation in Florida. He testified that he will permit Ashley, Justin, and the children to reside in his home rent free. He also testified that Ashley and Justin will only be responsible for paying "the electricity bill and the cable." Ashley's father testified that he is employed as the vice president of a water treatment company and that Justin is one of his employees. Justin earns $18 per hour plus $400 to $600 per month in commissions. In addition, there are opportunities for Justin to advance in the company. Ashleys' father generally testified that despite the domestic violence incident in 2013, he has no concerns regarding Justin's living in his home or being in a relationship with Ashley.

Preston's father testified that Preston is "a really good dad" who loves Payton. He described Preston as being patient, active, and involved with his children. Preston's father acknowledged that Preston has made mistakes and that he does have a problem with alcohol. However, he also testified that he does not have any concerns regarding Preston's parenting abilities. Preston's father testified that Ashley is a devoted mother to Payton, but he did not believe that moving to Florida was in Payton's best interests because Payton has "a lot of [extended] family" in Nebraska.

Following the modification hearing, the district court entered its order on February 28, 2018. In the order, the court granted Ashley's complaint to modify custody and to remove Payton to Florida. The court also modified the prior paternity order and parenting plan by awarding Ashley sole legal custody of Payton. The court awarded Preston parenting time for 6 weeks during each summer and for Payton's Christmas break from school every other year. Preston is to be responsible for Payton's travel expenses to and from Nebraska. In addition, the court ordered that Preston be permitted to have "reasonable" telephone contact with Payton. The court declined to modify Preston's child support obligation as "the issue of child support was not raised in [Ashley's] Complaint for Modification."

Preston appeals from the district court's order.

## III. ASSIGNMENTS OF ERROR

Preston assigns that the district court erred in (1) finding that permitting Ashley to move to Florida with Payton was in Payton's best interests, (2) awarding Ashley sole legal custody of Payton, (3) failing to modify the prior child support order, and (4) failing to find Ashley in contempt for not complying with the previous parenting plan.

## IV. STANDARD OF REVIEW

[1,2] Child custody and visitation determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Dragon v. Dragon*, 21 Neb. App. 228, 838 N.W.2d 56 (2013). The same standard applies to the modification of child support. *Armknecht v. Armknecht*, 300 Neb. 870, 916 N.W.2d 581 (2018). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Dragon v. Dragon, supra*.

[3] In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which the trial court's (1) resolution of issues of law is reviewed de novo, (2) factual findings are reviewed for clear error, and (3) determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Patera v. Patera*, 24 Neb. App. 425, 889 N.W.2d 624 (2017).

## V. ANALYSIS

### 1. Removal to Florida

Preston challenges the district court's decision to allow Ashley to move with Payton to Florida. Specifically, he asserts

that such a move is not in Payton's best interests. Upon our review of the evidence, we cannot say that the district court abused its discretion in permitting Ashley to move to Florida with Payton. As a result, we affirm this portion of the district court's decision.

[4] In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Dragon v. Dragon, supra*.

(a) Legitimate Reason
for Leaving State

[5] In his brief on appeal, Preston states that although he "disputes Ashley's reason for moving, he concedes that the record does not support an abuse of discretion as to the threshold inquiry of a legitimate reason to move." Brief for appellant at 16. We agree with Preston's concession. The evidence presented at the modification hearing revealed that Ashley offered two reasons for wanting to move to Florida. First, she wants to live with her fiance, Justin. Ashley and Justin have been in a relationship for a significant period of time and share two young children together. They plan to marry sometime in 2018. Justin has found a good job in Florida. Ashley also desires to improve her own employment situation by moving to Florida. There, Ashley found a job which provides her with a slightly higher income, much more room for advancement, and more time to spend with her children. Both the desire to form a new family unit through remarriage and the career advancement of the parent have been found to constitute legitimate reasons for leaving the state. See *Daniels v. Maldonado-Morin*, 288 Neb. 240, 244, 847 N.W.2d 79, 82 (2014) (stating that absent evidence of ulterior motive, courts have held that "career advancement of the parent, career advancement of the new spouse, and the desire to form a new family unit

through remarriage are legitimate reasons to remove a child to another jurisdiction").

Given that Preston does not assign error to the district court's decision that Ashley had a legitimate reason for leaving the state and given the evidence presented at the modification hearing, we find no abuse of discretion in the district court's decision that Ashley "met the threshold requirement of proving a legitimate reason for moving."

## (b) Best Interests

[6] After demonstrating a legitimate reason for leaving the state exists, the custodial parent must next show that it is in the child's best interests to continue living with him or her. See *Daniels v. Maldonado-Morin, supra*. The paramount consideration is whether the proposed move is in the best interests of the child. *Id*. We examine three broad considerations in determining whether removal to another jurisdiction is in a child's best interests: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation arrangements. See *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000).

### (i) Each Parent's Motives

[7] The ultimate question in evaluating the parties' motives is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). In this case, we agree with the district court that "neither party acted in bad faith or with ill motives in seeking or opposing removal."

The evidence reveals that Ashley's primary motives in seeking removal are her desire to live with Justin, with whom she shares two young children, and her desire to maintain

employment as a licensed practical nurse with a higher rate of pay and a better work schedule. Ashley provided evidence to demonstrate that because of her new employment and Justin's new employment in Florida, her family will be in a better financial position than they were in Nebraska. In addition, she will be able to spend more time with her children due to her new schedule.

Preston testified that he opposes the removal because he wishes to preserve his current relationship with Payton. Prior to Preston's incarceration, he was involved in Payton's activities and saw her four or five times per week. This level of involvement would be impossible if removal was granted.

We find that both parents have valid reasons for and against removal of their child to Florida. Their motives being equal, this factor does not weigh for or against removal.

### (ii) Quality of Life

[8,9] In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent. *Boyer v. Boyer*, 24 Neb. App. 434, 889 N.W.2d 832 (2017). This list of factors to be considered in determining the potential that the removal to

another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children should not be misconstrued as setting out a hierarchy of factors. *McLaughlin v. McLaughlin, supra.* Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id.*

### a. Factors Favoring Removal

Evidence presented at the modification hearing revealed that, for a majority of Payton's life, both Ashley and Preston have been involved in meeting her needs. However, the evidence also reveals that Ashley has really been Payton's primary caregiver and the parent responsible for her emotional, physical, developmental, and financial needs. Preston did spend time with Payton on a regular basis until his incarceration began in January 2017. Nevertheless, by the time of the hearing, he had not seen Payton in approximately 11 months because of his incarceration. According to Ashley's testimony, this is not the first time that Preston has been incarcerated and unable to see Payton during her lifetime. Ashley indicated that, currently, Payton is upset with Preston because of his extended absence. Ultimately, we agree with the district court that Ashley "has a more stable and constant presence in Payton's life and has been the one historically responsible for her emotional, physical, and developmental needs."

The third, fourth, and ninth factors are best examined together. Ashley testified at the modification hearing that the move to Florida will enhance her income and improve her work schedule. Prior to accepting her new position in Florida, Ashley worked at Madonna in Lincoln. She testified that at Madonna, she was required to work nights, some weekends, and some holidays in order to maintain her annual salary of $45,000. Ashley testified that at her new job in Florida, she would earn approximately $3 more per hour than at her old job, without having to work any nights, weekends, or holidays. In addition, there are opportunities for her to advance.

Ashley also presented evidence that Justin's income would be enhanced by moving to Florida. In Florida, Justin has secured a good job, where he earns approximately $5 more per hour than he was earning at his previous job in Nebraska. In addition, he earns between $400 and $600 in commissions each month and there are opportunities for him to advance and earn even more income.

There was evidence to demonstrate that Ashley, Justin, and their family will reside with Ashley's father in Florida. Ashley testified that her father's house in Florida has been recently remodeled and is in "good condition." She indicated that the house is newer than where she and Payton resided in Nebraska and has a great deal of outdoor space for the children to play. In addition, Ashley testified that the house is near a number of outdoor recreational opportunities. Ashley and Justin will not have to pay rent to Ashley's father while they reside with him in Florida. As such, Ashley and Justin will be able to spend or save more of their enhanced income than would occur if they remained in Nebraska. We do note that there was no evidence presented about Preston's home before he became incarcerated, nor was there any evidence about his plans for obtaining housing after his release.

b. Neutral Factors

Payton did not testify as to her living preference during the modification hearing. However, in a discovery document which was offered into evidence at the hearing by Preston, Ashley indicated that Payton has expressed a strong desire to move to Florida. We do not give this evidence much weight, since the information was not received directly from Payton.

Although Ashley did testify about the high quality of the school that Payton would attend in Florida, she also indicated that Payton's school in Nebraska was good and that Payton was excelling there. Accordingly, there was no significant testimony demonstrating one location to have an educational advantage over the other.

Finally, the evidence shows that there is hostility between the parties, primarily as a result of Ashley's desire to move to Florida. Any decision in this case has the potential to antagonize the hostilities between the parties. Ashley could be hostile toward Preston if she is not allowed to move to Florida to be with Justin, who is the father of her two other children. Similarly, Preston may be hostile if Ashley is allowed to move to Florida with Payton. Therefore, this factor does not weigh in favor of or against removal.

### c. Factors Against Removal

Both Ashley and Preston testified that a majority of Payton's family resides in Nebraska, including Preston's entire family, Ashley's mother, Ashley's sister, and Ashley's stepmother's family. The evidence demonstrates that Payton is very close to her extended family and that they are a large part of her life. In addition, Preston's two other children, who Payton is very close to, also reside in Nebraska. If Payton were to move to Florida, she would be living with Ashley's father and stepmother, who she is also very close to. In addition, she would reside with two of her half siblings. Ashley testified that she would bring Payton back to Nebraska a few times per year to visit her family, but even with frequent visits, Payton will not enjoy the same relationship with her Nebraska family members.

Similarly, it is likely that the quality of relationship enjoyed by Preston and Payton will suffer given the loss of frequent contact that would be occasioned by a move to Florida. Notably, however, this factor is tempered by the fact that Preston, through his own misconduct, has already hindered his relationship with Payton.

### d. Quality of Life Conclusion

The district court concluded that as a whole the quality of life factors weighed in favor of removal. Given the evidence presented at the modification hearing, we cannot say that the district court abused its discretion in reaching its conclusion.

### (iii) Impact on Noncustodial Parent's
### Contact With Child

[10,11] The third factor in the best interests determination is the impact of the move on the contact between a child and the noncustodial parent, when viewed in light of reasonable visitation arrangements. *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008). This consideration focuses on the ability of the court to fashion a reasonable visitation schedule that will allow the noncustodial parent to maintain a meaningful parent-child relationship. *Id.* Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Id.* Of course, the frequency and the total number of days of visitation and the distance traveled and expense incurred go into the calculus of determining reasonableness. *Id.* Indications of the custodial parent's willingness to comply with a modified visitation schedule also have a place in this analysis. *Id.*

There will be an impact from the move on the contact between Preston and Payton. Preston testified that prior to his incarceration in January 2017, he saw Payton four or five times per week. There was also evidence that Preston has been involved in Payton's extracurricular activities. Obviously, if Payton moves to Florida, Preston will no longer enjoy the frequent in-person contact that he enjoyed prior to January 2017.

The district court awarded Preston 6 consecutive weeks of parenting time during Payton's summer vacation from school. In addition, Preston was awarded Payton's entire Christmas break every other year. The district court also ordered that Preston was permitted to have reasonable telephone contact with Payton, "taking into account school hours, work hours, time zone changes, expenses, and other relevant factors." Ashley also testified at the hearing that she would facilitate "Skype" conversations between Preston and Payton.

Given the record presented in this case, we must conclude that the district court abused its discretion in fashioning a

reasonable visitation schedule for Preston and Payton. Prior to his incarceration, Preston saw Payton multiple times every week and was, essentially, a part of her daily life. In the district court's order granting Ashley's request to remove Payton to Florida, the court awarded Preston only three blocks of parenting time over a 2-year period. Such a limited amount of time together will not foster Preston's relationship with Payton, especially considering that in the years Preston does not see Payton over her Christmas break, he will go nearly a full year without any in-person contact with her. We note that the parenting time awarded is less than the amount of time Ashley offered in her testimony.

However, we do believe that a parenting plan can be created which would foster Preston and Payton's relationship even while Payton resides in Florida. Accordingly, we modify the district court's parenting plan such that, in addition to the 6 weeks of summer visitation and the alternating year Christmas vacation from school, Preston will also have parenting time during the Thanksgiving holiday on the years he does not see Payton for Christmas. We note that in her trial testimony, Ashley indicated her acquiescence to such an arrangement.

Additionally, if Preston chooses to travel to Florida during Payton's school year, he should be permitted to have parenting time with Payton from Friday after school to Sunday at 5 p.m. during any weekend he is present. Preston must provide Ashley with notice of the weekend he intends to travel to Florida at least 30 days in advance of his weekend parenting time. He shall also be limited to no more than two weekends in any 4-week period.

Finally, Ashley testified that she intends to return to Nebraska at times in order to visit family. She indicated that when she is in Nebraska, she would allow Preston to visit with Payton. However, Ashley's offer was not memorialized in the parenting plan. We find that the parenting plan should be modified to include a provision which permits Preston to have parenting time with Payton when she is in Nebraska with Ashley for not

less than 4 hours for every 2 days Ashley and Payton are visiting Nebraska.

Although we conclude that Preston's relationship with Payton will not be of the same quality that could occur if removal were denied, we also conclude that the parenting plan, as modified above, provides a reasonable visitation schedule that will continue to foster a meaningful relationship between Preston and Payton.

### (iv) Best Interests Conclusion

The district court did not abuse its discretion in finding that Ashley had a legitimate basis for seeking removal of Payton from Nebraska to Florida due to her employment opportunity and due to her imminent marriage to Justin, who is currently employed in Florida. Further, in reviewing the best interests considerations set forth in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), as applied to the evidence in this case, we cannot say that the district court abused its discretion by granting Ashley's request to remove Payton from Nebraska to Florida.

### 2. LEGAL CUSTODY

The original paternity order and parenting plan provided that Preston and Ashley were to share joint legal custody of Payton. The district court modified the parties' joint legal custody arrangement in the modified parenting plan such that Ashley was awarded sole legal custody of Payton. On appeal, Preston argues that the district court erred in modifying legal custody of Payton when Ashley did not request such relief in her complaint for modification. We find Preston's assertion to have merit.

[12] The Nebraska Supreme Court has previously stated that a trial court has no authority to modify a prior custody order without notice to the parties and an opportunity to be heard. See *Schnell v. Schnell*, 12 Neb. App. 321, 673 N.W.2d 578 (2003). In this case, Ashley did not specifically request in her complaint for modification that the prior custody order

be modified to provide her with sole legal custody, nor did either of the parties specifically testify about the legal custody arrangement. Given that Ashley did not raise the issue of legal custody in her pleading and given that neither party addressed legal custody during their testimonies, we find that the district court did not have the authority to modify legal custody of Payton. There is no indication that either party understood the modification of legal custody to be at issue during the proceedings. Accordingly, there is no indication that either Ashley or Preston had notice that the modification of legal custody should be addressed at trial. We reverse the district court's order to the extent it modified legal custody. The parties will continue to share joint legal custody, as was awarded in the original parenting plan.

## 3. CHILD SUPPORT

In the district court's order, it declined to modify Preston's child support obligation because "the issue of child support was not raised in the Amended Complaint for Modification of Order." On appeal, Preston asserts that the district court erred in failing to modify his child support. He argues that the issue of child support was sufficiently raised by Ashley's complaint for modification when she asked for "such other relief as may be just and equitable in the premises." He also argues that because Ashley agreed during her testimony at the modification hearing to waive child support in order to provide Preston with more money to pay for travel expenses, such waiver should have been granted.

Assuming without deciding that the issue of child support was properly raised before the district court, we do not find an abuse of discretion in the district court's ultimate decision to not modify the original child support order. In the original paternity order and parenting plan, Preston was obligated to pay $150 per month in child support for the benefit of Payton. Preston admitted that he has not been paying all of his child support obligation. In fact, the evidence presented

at the modification hearing revealed that Preston has not paid any child support to Ashley since his incarceration began in January 2017.

[13] Ashley did testify at the modification hearing that she was willing to waive child support so that Preston would have more funds available to pay for travel expenses. However, there was no other credible evidence presented to demonstrate whether such a waiver was necessary given Preston's financial circumstances or whether such waiver would be in Payton's best interests. Among the factors to be considered when contemplating a modification of child support are the changes in the financial position of the parent obligated to pay support, the needs of the children for whom support is paid, the good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent. See *Sabatka v. Sabatka*, 245 Neb. 109, 511 N.W.2d 107 (1994).

Preston did not provide any specific testimony about his current financial situation. He has been incarcerated since January 2017, and he did not provide any information about when he is expected to be released or what his plans were after his release. He provided some vague testimony about a job he claimed to have had for the past 2 years, but it is not clear whether this job existed only prior to his incarceration, whether he was working via work release at the time of the trial, or whether this job will be available to him after his release. Preston also did not provide any information about his financial support of his other two children.

Given the lack of credible evidence about Preston's current financial circumstances and given that the original child support he is obligated to pay is only $150 per month, we do not find that the district court abused its discretion in failing to modify child support. Although Ashley's agreement to waive child support is laudable, there is simply no evidence that such a waiver is in Payton's best interests. The paramount concern and question in determining child support is the best interests

of the child. *Sabatka v. Sabatka, supra*. Moreover, there is simply no evidence that Preston will be unable to afford any travel expenses associated with his parenting time in addition to his $150 per month in child support.

## 4. Contempt Action

Preston asserts that the district court erred in failing to find Ashley in contempt for violating the original paternity order and parenting plan. Specifically, Preston asserts that evidence presented at the contempt hearing revealed that Ashley violated the original paternity order and parenting plan when she (1) changed addresses without informing Preston, (2) attempted to enroll Payton in school in Florida, and (3) intended to move Payton to Florida prior to the district court's granting her permission to do so. Upon our review, we conclude that we do not have jurisdiction over the district court's decision to deny Preston's motion to hold Ashley in contempt. Accordingly, we do not address the merits of Preston's assertions.

[14,15] Before reaching the legal issues presented for review, it is the duty of an appellate court to settle jurisdictional issues presented by a case. *Connelly v. City of Omaha*, 278 Neb. 311, 769 N.W.2d 394 (2009). Notwithstanding whether the parties raise the issue of jurisdiction, an appellate court has a duty to raise and determine the issue of jurisdiction sua sponte. *Id*. For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken. *Id*. Here, there is no written order contained within our record which purports to deny Preston's contempt motion. The only disposition of this motion contained in our record is the district court's oral pronouncement in court immediately after the contempt hearing on August 7, 2017.

[16] Neb. Rev. Stat. § 25-1301 (Reissue 2016) sets forth two ministerial requirements for a final judgment. The first is rendition of the judgment, defined as "the act of the court, or a judge thereof, in making and signing a written notation of the

relief granted or denied in an action." § 25-1301(2). The second ministerial step for a final judgment is that entry of a final order occurs when the clerk of the court places the file stamp and date upon the judgment. § 25-1301(3). In sum, final orders must be signed by the judge as well as file stamped and dated by the clerk. *In re Trust Created by Crawford*, 20 Neb. App. 502, 826 N.W.2d 284 (2013).

[17] However, Neb. Rev. Stat. § 25-1912(2) (Reissue 2016) provides:

> A notice of appeal or docket fee filed or deposited after the announcement of a decision or final order but before the entry of the judgment, decree, or final order shall be treated as filed or deposited after the entry of the judgment, decree, or final order and on the date of entry.

In *State v. Brown*, 12 Neb. App. 940, 687 N.W.2d 203 (2004), this court noted that announcement of a decision can come, among other ways, from the bench orally, from trial docket notes, from file-stamped but unsigned journal entries, or from signed journal entries which are not file stamped. Section 25-1912(2) creates what we have called potential jurisdiction or springing jurisdiction, wherein an announced decision creates a situation where the appellate court potentially has jurisdiction that will spring into existence when the announced decision is properly rendered and entered. See *State v. Brown, supra*. In the present case, the district court announced its decision from the bench on August 7, 2017, which announcement created potential jurisdiction, but there is no appealable order until such time as the court renders a final decision that is signed, dated, and file stamped.

We must also note the day after the district court orally indicated that it did not find Ashley to be in contempt and that Preston's motion was dismissed, Preston filed a motion to reconsider. There is nothing in our record which indicates the motion to reconsider was ever ruled on by the district court. As such, even if Preston provides this court with a properly entered decision on his motion for contempt, a

further jurisdictional issue remains with regard to his motion to reconsider.

[18] We review a postjudgment motion based on the relief it seeks, rather than its title. *Clarke v. First Nat. Bank of Omaha*, 296 Neb. 632, 895 N.W.2d 284 (2017). If the postjudgment motion seeks a substantive alteration of the judgment—as opposed to the correction of clerical errors or relief wholly collateral to the judgment—a court may treat the motion as one to alter or amend the judgment. *Id.* Neb. Rev. Stat. § 25-1329 (Reissue 2016) provides:

> A motion to alter or amend a judgment shall be filed no later than ten days after the entry of the judgment. A motion to alter or amend a judgment filed after the announcement of a verdict or decision but before the entry of judgment shall be treated as filed after the entry of judgment and on the day thereof.

Section 25-1912(3) provides that the running for the time for appeal shall be terminated by the filing of a timely motion to alter or amend judgment. Section 25-1912(3) further specifies:

> When any motion terminating the time for filing a notice of appeal is timely filed by any party, a notice of appeal filed before the court announces its decision upon the terminating motion shall have no effect, whether filed before or after the timely filing of the terminating motion. A new notice of appeal shall be filed within the prescribed time after the entry of the order ruling on the motion. No additional fees are required for such filing.

From the record now before us, it appears that Preston's motion to reconsider was timely filed and that there has been no announcement or rendition of a decision on the motion to reconsider. Thus, with regard to the district court's decision to deny his motion for contempt, Preston's notice of appeal is of no effect. A new notice of appeal must be filed within 30 days of entry of an order ruling on his motion to reconsider.

In summary, this court does not have jurisdiction to review Preston's assigned error involving the denial of his contempt

motion until he (1) obtains properly rendered and file-stamped orders denying his motions for contempt and to reconsider and (2) files a new notice of appeal within 30 days of such ruling on his motion to reconsider.

## VI. CONCLUSION

For the reasons set forth above, we affirm the district court's order to the extent it permitted Ashley to move to Florida with Payton and declined to modify Preston's child support obligation. We reverse the court's order to the extent it awarded Ashley sole legal custody of Payton. We modify the court's order with regard to the amount of parenting time awarded to Preston. Finally, we conclude that we do not have jurisdiction over Preston's contempt action, as a final order has not been entered.

AFFIRMED IN PART, AFFIRMED IN PART AS MODIFIED,
REVERSED IN PART, AND IN PART DISMISSED.