IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

BROWN V. BROWN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

EDWIN F. BROWN, APPELLANT,

V.

DELANA L. BROWN, NOW KNOWN AS DELANA L. RAMIREZ, APPELLEE.

Filed June 25, 2019.    No. A-18-521.

Appeal from the District Court for Lancaster County: SUSAN I. STRONG, Judge. Affirmed.

David P. Kyker for appellant.

Terrance A. Poppe and Anne E. Brown, of Morrow, Poppe, Watermeier & Lonowski, P.C., for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Edwin F. Brown appeals the order of the district court for Lancaster County, which denied his complaint to modify custody of the parties' children previously awarded in the decree of dissolution to DeLana L. Brown, now known as DeLana L. Ramirez. He also appeals the district court's failure to find that DeLana was in contempt of the original divorce decree. For the reasons set forth below, we affirm.

## II. BACKGROUND

Edwin and DeLana were married in May 2004, and they have two children: Vicente, born in 2006, and MariElena, born in 2008. Edwin and DeLana separated in January 2012, and Edwin filed a complaint for dissolution of marriage. On February 5, 2013, the district court entered a decree, dissolving Edwin and DeLana's marriage and awarding physical and legal custody of the

- 1 -

children to DeLana, subject to Edwin's rights of parenting time. The following provisions from the parenting plan are relevant to this appeal:

### C. LOCATION OF THE CHILDREN DURING THE WEEK

The **Father** should be allowed reasonable parenting time with the parties' children including, without limitation, as follows:

1. Every other weekend from Sunday at 2:00 p.m. to Thursday at 8:00 a.m. or the commencement of school whichever is earlier.

### D. TRANSITION PLAN

. . . .

Unless otherwise agreed between the parents, the Father is to provide transportation for his parenting time with the children. If the Father is 15 or more minutes late to pick up the children for a scheduled parenting time, he forfeits that parenting time. The failure of the Father to return the children within 15 minutes of the conclusion of his parenting time will constitute a waiver of his next scheduled parenting time; however his failure to insure that the children are delivered to school in a timely fashion (i.e., not being tardy) will also constitute a waiver of his next scheduled parenting time.

. . . .

### E. DAY TO DAY DECISION MAKING

The Mother of the children shall have the final say in all day to day decision making relating to the minor children that shall include primacy in the choices regarding the children's education, religious upbringing and medical needs. Recognizing the importance that mutual participation and cooperation play in nurturing the children in a stable and loving environment, the Mother shall freely discuss these issues with the Father in an effort to reach a consensus of these issues at a meaningful time in advance of such decision. In the event of an impasse, however, the Mother shall have the final say of these matters.

### F. PROVISION FOR FUTURE MODIFICATIONS

With respect to the resolution of any future changes or conflicts regarding parenting functions or this parenting plan, the Father and the Mother shall first seek resolution through mutual agreement and, if not successful, they shall then seek the assistance of a qualified mediator. The cost of mediation shall be split equally between the Father and the Mother. Judicial intervention can only be sought after mediation has not been successful in resolving any conflict between the Father and the Mother.

### G. MAXIMAZATION OF THE SAFETY OF ALL OF THE PARTIES AND THE CHILDREN

The children's best interests require the utmost cooperation between Mother and Father. To this end, neither party shall disparage the other or in any way denigrate the other party, in any activity or communication involving their child. Neither party will inquire of the other's personal affairs through the children. Each party shall cooperate with the other to the fullest extent necessary in order to foster and promote a safe, secure, and loving environment for the children.

### H. COMMUNICATION

Face-to-face communication is not a reasonable method for issue resolution between the Father and the Mother at his [sic] time. Additionally, the parents are not to

exchange information through the children. As a result, the primary method of communication between the Father and the Mother is to be via email/regular mail/voice mail/or other social network media. The communication is to be made in a businesslike manner, without language that is sarcastic, derogatory, inflammatory, demeaning, judgmental or accusatory or that digresses with a historical statement of past problems or failures to cooperate. Neither the Father nor the Mother is to engage in name calling. Communication is to be direct and short and is to state the issues, explanatory information and suggested resolution. The responding parent is to acknowledge receipt of the communication and is to respond in a timely manner or is to request clarification, as necessary.

. . . .

### J. ACCESS TO RECORDS AND EMERGENCY DECISION MAKING

Each parent shall continue to have full and equal access to the education and medical records of his or her children. Either party is authorized to make emergency decisions affecting the health or safety of his or her children while the children are in the physical custody of either parent.

. . . .

### L. PROVISION REGARDING EXTRA-CURRICULAR ACTIVITIES

Both parties shall inform one another reasonably in advance of all events where a parent may participate in the children's activities or events (for example, school plays, teacher conferences, sporting events, music recitals, etc.) Notice shall be provided in such a way that the other parent have the maximum opportunity to attend that activity or event as it is important to the children's developmental process. The parties recognize the importance of extra-curricular activities for the children and their children's wishes and desires with regard to those activities shall be considered to be of paramount importance and each party shall insure, to the extent reasonably possible, that the minor children attend their extracurricular [sic] activities.

### M. SCHEDULING

Neither the Father nor the Mother shall schedule, permit to be scheduled or accept any invitation to any activity (e.g., school activity, extra-curricular activity, birthday party or other social activity) for or on behalf of either of the children that conflicts with the parenting time of the other parent, without notice to and prior written consent from the other parent.

Edwin filed a request for modification of custody in late 2014 or early 2015, and after trial, an order was entered in June 2015 denying Edwin's request.

1. PRESENT MODIFICATION ACTION

In October 2016, Edwin filed another complaint to modify custody and child support. In his operative pleading, Edwin alleged that a material change of circumstances had occurred that was not contemplated by the parties at the time of the decree was entered. Edwin alleged that he and DeLana had moved closer to one another, which would better enable joint physical custody and required a modification of the parenting plan's transportation provisions; that DeLana had

failed to meaningfully participate in mediation; that DeLana had failed to comply with the current parenting plan; that DeLana had detrimentally impacted his relationship with their children; that he had a flexible employment schedule that gave him increased availability to provide care for the children while DeLana worked; that his earning capacity had decreased substantially while DeLana's earning capacity has increased substantially; and that applying the Nebraska Child Support Guidelines would decrease his child support obligation by more than 10 percent. He alleged that these material changes in circumstance warranted modifying the parenting plan to award him legal and physical custody of the children, or alternatively joint legal and physical custody, as well as a recalculation of his child support obligation.

In April 2017, Edwin filed a motion for transportation assistance, asking the court to authorize him to use a third party to assist with transportation and to effectuate visitation. The court granted Edwin's motion, and entered an order that authorized certain individuals to provide transportation assistance to Edwin in exercising his parenting time.

DeLana filed an answer to the operative complaint and a "cross complaint" for modification. She admitted Edwin's foundational allegations, but denied his substantive allegations. She alleged that Edwin's earnings and earning capacity had increased since the entry of the decree such that applying the Nebraska Child Support Guidelines would increase his obligation to pay child support by more than 10 percent. Thus, she asked the court to enter an order increasing Edwin's child support obligation, and to award her a reasonable attorney fee.

Edwin also filed an application for an order to show cause in October 2017, alleging that DeLana failed and refused to obey the decree of dissolution and attached parenting plan. Edwin alleged that DeLana violated the provisions regarding parenting time, transitions, child safety, and scheduling by changing the start time and location of his parenting time on various dates and without his consent due to the children's activities; by refusing on occasion to relinquish the children to him; by cancelling his parenting time at the last minute on several dates; by cancelling his parenting time after the children were tardy or absent from school; and by acting in a derogatory and demeaning manner toward a court-approved transportation assistant. Edwin alleged that DeLana violated the provision regarding decisionmaking by allowing Vicente to quit a basketball team without consulting him. Edwin alleged that DeLana violated the provision regarding future modifications by not agreeing to mediate parenting time disputes. Edwin alleged that DeLana violated the provision regarding communication by using the children to communicate changes in his parenting time to him on various occasions; and by routinely failing to reply to his requests for discussions about issues for months or even not at all. Edwin alleged that DeLana violated the provision regarding access to records by not providing the children's immunization histories to him when he asked for them. Finally, Edwin alleged that DeLana violated the provision regarding the children's extracurricular activities by enrolling the children in activities without informing him about them; by failing to provide his contact information to the children's coaches and teachers; by failing to provide him with the schedules for the children's extracurricular activities; and by changing his parenting time on account of these activities without his consent.

On November 7, 2017, the district court entered an order to show cause, directing DeLana to appear so as to show cause as to why she should not be found in contempt for violating the decree and the transportation order.

## 2. TRIAL

The district court held a trial on Edwin's complaint for modification of decree, DeLana's counter complaint for modification, and the order to show cause on December 19, 2017, and February 1, 2018. In addition to the parties, several witnesses testified, and numerous exhibits were received in evidence.

### (a) Reyes' Testimony

Stephen Reyes testified that he had known Edwin for more than 20 years and that he is Vicente's godfather. He had also known DeLana's family for an extended period of time. Since the parties' divorce, Reyes had seen Edwin with Vicente and MariElena about once per month, during which time he observed Edwin to be an involved father. Reyes attended many of Vicente's athletic events, and he admitted that Edwin was not present at all of the events that he attended. Although Reyes observed Edwin to be frustrated with his custody situation, he had never heard Edwin speak negatively, disparagingly, or derogatorily of DeLana in the presence of the children.

Edwin asked Reyes to retrieve the children from DeLana and deliver them to a performance of Edwin's band on May 7, 2017, which the court's transportation order permitted him to do. When Reyes arrived at DeLana's house to retrieve the children, DeLana informed him that she was the children's primary caregiver. She then demanded to inspect Reyes' drivers' license, which he did not allow. DeLana asked Reyes whether he had her phone number. When he replied that he did not, she wrote her number on a piece of paper and threw the paper at him. DeLana told Reyes that it seemed Edwin's performance was more important to him than his time with his children, and then she cursed at him. Reyes claimed that the children stood directly behind DeLana as this exchange occurred and that the look on their faces while DeLana spoke bothered him.

### (b) Edwin's Testimony

Edwin testified that he filed the modification and contempt action because of DeLana's "abuses." He felt that DeLana was specifically acting to alienate him from his children and that she did not involve him in decisionmaking. He felt that he led by example in his co-parenting relationship with DeLana. He had recently purchased a three-bedroom single family home that was near DeLana's house and the children's school. The court received Edwin's proposed parenting plan, suggesting that the court award him sole physical custody and that he and DeLana receive joint legal custody.

Edwin believed that DeLana violated the decree's provision concerning day-to-day decisionmaking by allowing Vicente to quit a basketball team without consulting him. DeLana advised Edwin in an email that Vicente would be quitting the team, and the only explanation she gave was that Vicente disliked the coach.

Edwin claimed that DeLana would send him emails just before his parenting time began to inform him that his parenting time would commence after the children's extracurricular activity. He provided multiple examples of this occurring. Edwin had never given DeLana written consent to alter his parenting time for the children's activities, nor had he given consent for the children to participate in the activities. Edwin asserted that DeLana would take the children to activities before his parenting time began, and then she would require him to pick the children up from their activity rather than from her house. In the 6 to 10 months before trial, DeLana used Vicente to

communicate these parenting time alterations to Edwin. Edwin provided several examples of Vicente communicating with him in DeLana's stead. Edwin testified that his parenting time was precious to him. Although he wanted his children to be involved in extracurricular activities, he also wanted to be involved in scheduling those activities.

Edwin claimed that DeLana sent him a derogatory message on July 31, 2016. He had failed to take MariElena to a soccer game scheduled that day because he believed the game would be cancelled as it had rained earlier in the day. DeLana emailed and texted Edwin to ask whether MariElena would attend the game. Edwin replied that she would not, that she was asleep, and that they were on their way to Omaha. An argument ensued in which DeLana used an expletive.

Edwin sent DeLana an email on June 30, 2016, asking for the children's doctor's information. He needed the information to register the children for a camp that would occur during his parenting time. Because he did not receive a reply, Edwin again emailed DeLana on July 10, 2016, asking for the information. Her only response to him was that the children's doctors had not changed. Edwin admitted that DeLana had always taken the lead with regard to the children's medical needs.

Edwin claimed that Vicente participated at a swim meet in June 2017. DeLana did not inform him that Vicente had joined a swim team, and as a result, Edwin could not attend the meet. Edwin claimed that he was not aware that Vicente had participated in a basketball team in June 2016 until the last game of the season. Edwin also claimed that the children had participated in two foot races about which DeLana had not informed him.

Edwin explained that when DeLana did inform him that she enrolled the children in an extracurricular activity, she often would not provide him with the name of the coach or that coach's contact information. As an example, he noted that when DeLana signed Vicente up for baseball, she told Edwin the team's name and the organization with which it was associated. DeLana indicated that the schedule and other information would be available online. Edwin claimed that it never was. He requested that DeLana provide the children's coaches with his contact information. He also wanted to be involved in deciding whether the children would participate in these activities in the first place. He admitted, however, that DeLana sent him the children's schedules some of the time. Edwin further admitted that his children's coaches were always accommodating whenever he approached them independently.

Edwin attended two different churches, and neither of those churches was the church that DeLana attended with Vicente and MariElena. Vicente and MariElena were students at the school that was attached to their church, and Vicente served and sang at weekday and Sunday services. When Vicente participated in weekday services, his teachers notified Edwin. But when Vicente participated in a Sunday service, Edwin received no notification. Edwin observed that Vicente's faith was very important to him, and he wanted to be involved with Vicente's interests. He admitted, however, that he had not informed DeLana that he would like to attend the services in which Vicente participated.

Edwin claimed that DeLana did not allow him to take the children to Chicago to attend the funeral of his cousin who had been murdered. In October 2017, Edwin took Vicente and MariElena to Colorado for the funeral a family friend's children, who had been murdered by their older brother. The funeral occurred on a Monday during his parenting time, and the children had the day off from school for other reasons. Edwin and the children remained in Colorado the day after the

funeral, and the children missed school. He left Colorado with the children at 11 p.m. on the second day, but they arrived in Lincoln in time for school the next day. Edwin only told DeLana that he was taking the children to an out-of-state funeral after DeLana asked him whether Vicente would be attending an extracurricular activity that was scheduled during the funeral. Because Edwin did not deliver the children to school on the day after the funeral, his next scheduled parenting time was cancelled. Edwin had also taken the children out of school for his band's performance and a vacation in South Dakota. Because the children were absent from school for this trip to South Dakota, his next scheduled parenting time after the trip was cancelled.

Edwin did not believe the parenting plan cancelled his next scheduled parenting time when he took the children out of school altogether, but rather only when he delivered the children to school tardy. He also felt that because his children's school only punished a child after he or she arrived to school tardy five times, he should not lose his parenting time until they were tardy more than five times. He asserted that DeLana had admitted this interpretation of the parenting plan in a November 2015 email. The children had been tardy twice in the 2016-2017 school year, both during Edwin's parenting time. The children had not been tardy at all in the 2017-2018 school year.

At the time of trial, Edwin had been employed by the Lincoln Chamber of Commerce for 5 months. In that position he received a salary of $40,000 per year with an estimate of an additional $7,000 per year in commissions. He also earned money from his band, his clothing business, and his contract work for an insurance company. His band performed three to four times each month. The court received Edwin's 2016 tax return, which showed that he had total income of $47,937 from his business ventures in 2016. Edwin had apparently filed for Chapter 7 bankruptcy in November 2017. The court received Edwin's bankruptcy form 1061, which provided Edwin's estimation that he would earn $4,030 from the insurance company, $12,700 from his band, and $14,964 from his clothing line in 2017. The court also received Edwin's calculation of his child support obligation, which was based on him having a total monthly income of $6,839 and on DeLana having a total monthly income of $8,000.

Edwin purchased a Cadillac Escalade in November 2015, valued at about $50,000. His monthly payment on the vehicle was over $600. When he purchased the vehicle, he was more than $13,000 delinquent on his child support obligation. By the time of trial, he was $22,790 behind on his child support obligation. A contempt proceeding was initiated against him through which a purge plan was ordered. Although the purge plan had "expired" in the summer of 2016, Edwin had agreed to continue paying $450 per month above his child support obligation according to the plan until the conclusion of the modification trial.

### (c) DeLana's Testimony

DeLana had previously mediated disputes about the parenting plan at least twice. She did not continue mediating those disputes because she felt Edwin initiated proceedings too quickly. She testified that this modification trial was Edwin's third attempt to receive custody of the children. She did not believe granting Edwin custody of their children would be in their best interests. DeLana felt that the current parenting plan was effective and that it was in the children's best interests to maintain it.

In the time that she has known Edwin, he had changed jobs often, which made her concerned about his ability to provide for the children. DeLana observed that Edwin's band had performances more often since the entry of the divorce decree. Edwin was often absent from the children's extracurricular activities. The court received DeLana's notes recording which of the children's events that Edwin had failed to attend or to which he arrived late since his last attempt to modify the decree. The number of events Edwin missed are too voluminous to recount here.

DeLana testified that as she understood the parenting plan, Edwin forfeited his parenting time whenever the children arrived to school tardy. As a result, when the children missed school because they were with Edwin in South Dakota and Colorado, Edwin forfeited his next scheduled parenting time. The parenting plan's provision regarding tardiness from school had not always been strictly enforced. Since the provision had been enforced, however, the children had not had issues with arriving to school tardy. DeLana admitted that she had once taken the children out of school for a day for a vacation.

DeLana admitted that she allowed Vicente to quit basketball without consulting Edwin. She explained that Vicente had missed a large number of practices during Edwin's parenting time, and as a result, the coach had not allowed Vicente to play on the team. Because the coach did not allow Vicente to play, Vicente did not want to be on the team, and DeLana allowed him to quit. DeLana also admitted to cursing at Edwin when he failed to take MariElena to her soccer game. She explained that she had left work early to attend the game and that MariElena was responsible for the team's snacks. When DeLana arrived at the field, the coach asked her where her daughter was. DeLana could not remember the exact words she used during her conversation with Reyes on May 7, 2017, when he picked up the children on Edwin's behalf. She did remember, however, that Reyes became very defensive after she asked to see his drivers' license. DeLana claimed the children were not present during her conversation with Reyes and that Reyes is "a very good liar." She did not believe Reyes was a "good person," and was concerned about him transporting her children.

DeLana denied that either Vicente or MariElena had participated in a foot race or that they ever swam at a swim meet. She had signed the children up for swimming lessons, and they tried out for a swim team, but the children did not wish to participate in it. She speculated that because they tried out for the team, their names may have been announced at a swim meet. Despite Edwin's testimony to the contrary, DeLana claimed that she informed Edwin of Vicente's participation on the basketball team in 2016. She admitted that she may have given Edwin schedules for the children's extracurricular activities late on a few occasions, but she always informed him of their activities.

DeLana admitted that she had once failed to provide Edwin with the names of Vicente and MariElena's doctors when he asked. The information had not changed, and DeLana believed he already had it. She agreed that she would provide Edwin with the children's medical information in the future. DeLana also admitted to asking Vicente to convey parenting time information to Edwin "very few" times. She further admitted that she took the children to activities that began around the time that Edwin's parenting time began so as to ensure the children actually attend the event. Edwin often did not respond when she asked him whether he was planning to take the children to these events. Edwin knew when these events were scheduled. Further, he had never told her that he expected to pick up the children from her house in spite of their extracurricular

activities. Moreover, the children regularly missed their extracurricular activities during Edwin's parenting time.

DeLana admitted that she did not notify Edwin when Vicente participated in church services. She explained that she had little control over when Vicente participated in those services. The church bulletin had a schedule of when Vicente was scheduled to do certain activities in church. Vicente very much enjoyed those activities, and he often volunteered independently for them.

At the time of trial DeLana was the nursing director of the "Med/Surg and Pediatric Unit" at a Lincoln hospital. She earned $44.54 per hour in this position and worked about 40 hours per week.

### (d) Onuoha's and Jones' Testimony

Angelia Onuoha, a friend of Edwin's family, testified that she had observed Edwin with his children and that he was a good father. Paulette Jones, Edwin's mother, also testified that Edwin is a good father. She was unaware that Edwin was behind on his child support obligation, and she found his child support delinquency surprising considering the amount that he worked. From time to time, Jones had encountered DeLana in public places with her grandchildren. DeLana would not allow the children to approach their grandmother, and would promptly leave the location.

### (e) Bunger's, Martin's, and Potter's Testimony

Jamie Bunger, Vicente's fifth grade teacher, testified that Vicente struggled academically at the beginning of the school year. Bunger made recommendations to DeLana about how to improve Vicente's academic performance, which recommendations DeLana implemented. Bunger observed that Vicente's behavior and academic progress changed based on whether he was in Edwin's custody or DeLana's custody. Bunger had more contact with DeLana than Edwin, and Edwin had missed the school year's first parent-teacher conferences because he failed to schedule an appointment before the appointments had been filled. Dennis Martin, the children's school principal, testified that his records reflected that the children had been tardy to school during Edwin's parenting time. Edwin had never spoken with him about the children's tardiness issues. Julie Potter, DeLana's long-term friend and co-worker, testified that she attended many of the children's extracurricular activities, some of which Edwin did not attend.

### 3. MODIFICATION ORDER AND SUBSEQUENT MOTIONS

The district court entered a detailed order on March 12, 2018, denying Edwin's motion for modification and finding that DeLana was not in contempt of the decree's parenting plan. The court specifically found DeLana's testimony to be more credible than Edwin's testimony. The court did not find fault in DeLana for asking Edwin to cooperate with the children's extracurricular activities that were scheduled during his parenting time. Because DeLana testified that she would refrain from using Vicente to communicate information to Edwin in the future, the court did not find her in contempt of the parenting plan provision that prohibited the parties' communication through the children. The court found Edwin's choice to take the children out of state for band performances, funerals, and vacations without informing DeLana to be unacceptable, and the court emphasized the importance of school attendance. The court found that the record contained little

evidence of any change of circumstance, and insomuch as there was a change, that change favored reducing the amount of time and discretion Edwin had with his children. As a result, the court found that it was in the children's best interests to remain in DeLana's legal and physical custody.

Noting that Edwin's employment at the Chamber of Commerce would likely reduce his income from his other businesses, the court attributed an income of $6,250 per month to him and $7,583 per month to DeLana. In view of the evidence of the parties' increased incomes, the court increased Edwin's monthly child support obligation to $1,115 for two children and $812 for one child. Lastly, given the lack of evidence of any change in circumstances and finding Edwin's action to be more motivated by his financial concerns more than an actual desire to have custody, the court ordered Edwin to pay DeLana's attorney's fees in the sum of $8,205.50. In addressing the issue of fees, the court noted that a previous judge in 2015 found that "there was not one scintilla of evidence" presented by Edwin that would warrant a change in custody or parenting time from the time the decree was entered. The court concluded that the same was true in the present case.

Edwin filed a motion for a new trial and a motion to alter or amend the judgment, both of which the district court denied.

Edwin appeals.

### III. ASSIGNMENTS OF ERROR

Edwin assigns, restated, that the district court erred in (1) failing to find DeLana in contempt for her failure to comply with numerous provisions of the parenting plan and (2) failing to find a material change in circumstances due to DeLana's attempts to alienate the children from him, and (3) failing to award custody to him.

### IV. STANDARD OF REVIEW

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which the trial court's (1) resolution of issues of law is reviewed de novo, (2) factual findings are reviewed for clear error, and (3) determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Welch v. Peery*, 26 Neb. App. 966, 925 N.W.2d 375 (2019).

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Mansuetta v. Mansuetta*, 295 Neb. 667, 890 N.W.2d 485 (2017).

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Eric H., supra*.

## V. ANALYSIS

### 1. District Court Did Not Abuse Its Discretion in Determining DeLana Was Not in Contempt of Parenting Plan

Edwin assigns that the district court erred in failing to find DeLana in contempt for her failure to comply with numerous provisions of the parenting plan. Recounting much of his trial testimony, he argues that DeLana has "systematically" violated the parenting plan. We disagree.

When a party to an action fails to comply with a court order made for the benefit of the opposing party, such an act is ordinarily a civil contempt, which requires willful disobedience as an essential element. *Schroeder v. Schroeder*, 26 Neb. App. 227, 918 N.W.2d 323 (2018). "Willful" means the violation was committed intentionally, with knowledge that the act violated the court order. *Id.* Outside of statutory procedures imposing a different standard or an evidentiary presumption, all elements of contempt must be proved by the complainant by clear and convincing evidence. *Id.*

Edwin argues that DeLana violated the parenting plan by using disparaging language and name calling as well as by using Vicente to communicate with him. DeLana admitted to using Vicente to convey information to Edwin on a handful of occasions regarding Vicente's sporting events. However, the record shows that DeLana primarily communicated with Edwin about the children and parenting time matters. We agree with the district court that DeLana is not in willful contempt of the parenting plan for the few times that she had Vicente communicate directly with Edwin. Although DeLana admitted to losing her temper with Edwin out of frustration, the record does not show that she used derogatory language with Edwin. While Reyes claims that DeLana demeaned Edwin in the children's presence, DeLana denied that the children were nearby when she spoke with Reyes. The district court found DeLana's testimony to be credible. We agree with the district court's determination that, under these circumstances, Edwin failed to establish a violation of the parenting plan by DeLana.

Edwin argues that DeLana also violated the parenting plan by allowing his parenting time to be forfeited when he took the children out of school. He asserts that the forfeiture provision only applies to tardiness and not to absences for vacations and family emergencies. Although the provision only speaks to tardiness, the logical goal of the provision is to make sure Edwin brings the children to school during his parenting time. Clearly, the complete failure to ensure the children's school attendance is of greater concern than tardiness. The record shows that Edwin did not communicate with DeLana regarding these school absences, and there is no evidence about whether he communicated directly with the school. Thus, we agree with the district court's conclusion that DeLana was not in violation of the parenting plan for enforcing the forfeiture provision when Edwin failed to bring the children to school.

Edwin argues that DeLana violated the parenting plan by failing to discuss the children's extracurricular activities with him, to give him notice of those activities, and to receive consent from him for those activities to take place during his parenting time.

The record does not support Edwin's allegations that DeLana kept information regarding the children's extracurricular activities from him. DeLana testified that she did provide Edwin with information about all of the children's extracurricular activities. And even under Edwin's account, DeLana generally provided him with information that, by exercising reasonable diligence, he could

have independently found scheduling information for the children's extracurricular and religious activities. The district court specifically found that DeLana was more credible than Edwin, and we give that finding deference in our appellate review.

Although DeLana enrolled the children in activities that occurred during Edwin's parenting time, the evidence shows that Edwin was aware of the schedule of these activities, yet he failed to voice any objection to them. Further, it appears that scheduling some of the activities during Edwin's parenting time may have been unavoidable. Certainly, nothing prevented Edwin from attending and participating in these events during his parenting time. The parenting plan specifically recognizes the importance of extra-curricular activities for the children. The plan further requires that the children's wishes and desires with regard to those activities be considered to be of "paramount importance," and the parties are required to "insure, to the extent reasonably possible, that the minor children attend" their extracurricular activities. Thus, like the district court, we do "not find any fault with [DeLana] in asking [Edwin's] cooperation in allowing [the children] to participate" in these activities.

Edwin argues that DeLana violated the parenting plan by failing to provide the children's medical information to him when he asked. Although DeLana admitted that she did not give Edwin the names of the children's doctors on one occasion, she testified that she had given Edwin that information in the past. DeLana advised Edwin that their doctors' names had not changed. Nothing prevented Edwin from obtaining the medical information on his own. Further, DeLana agreed to provide Edwin with the children's medical information when he requests it in the future. Thus, we find that the district court did not abuse its discretion in determining that DeLana did not violate the parenting plan's provisions concerning medical information.

After reviewing the district court's factual findings for clear error, we conclude that the district court did not abuse its discretion in finding that DeLana was not in contempt for violating the parties' parenting plan.

## 2. DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING NO MATERIAL CHANGE IN CIRCUMSTANCES

Edwin assigns that the district court erred in failing to find a material change in circumstances due to DeLana's attempts to alienate the children from him. We disagree.

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Whilde v. Whilde*, 298 Neb. 473, 904 N.W.2d 695 (2017). A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Hall v. Hall*, 26 Neb. App. 877, 924 N.W.2d 733 (2019).

Edwin essentially argues that DeLana's "violations" of the parenting plan amount to a material change in circumstances that warrants a modification of custody. As we discussed above, we do not find that DeLana's actions violated the parenting plan, and therefore, we likewise do not find the alleged violations support a modification of custody. The record contains very little

other evidence of changes of circumstances. While Edwin has moved closer to DeLana and the children's school, he has not shown how this move makes him a more suitable parent for physical custody than DeLana. Edwin has provided no evidence that DeLana was an unfit parent or that the best interests of the children would favor placing them in his custody. Instead, the children are academically, socially, and spiritually thriving under DeLana's care. Contrary to his assertion, Edwin has not shown that the children's best interests are a priority for him in light of his substantial child support arrearage, his expenditure of time and resources on advancing his musical career, and his sporadic attendance at the children's activities.

After a de novo review of the record, we agree with the district court's factual findings, and we do not find them to be an abuse of discretion.

### 3. WE ARE NOT REQUIRED TO ANALYZE EDWIN'S REMAINING ASSIGNMENT OF ERROR

Because we find the record shows no material change in circumstances, we are not required to determine whether granting Edwin custody of Vicente and MariElena would be in their best interests.

### VI. CONCLUSION

For the foregoing reasons, we conclude that the district court did not abuse its discretion in finding that DeLana was not in contempt of the decree of dissolution. We also conclude the district court did not abuse its discretion in finding no material change in circumstances that would warrant modifying the decree.

AFFIRMED.