IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

HARPER V. HARPER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MAELYNE A. HARPER, APPELLEE,

V.

NICKOLAS J. HARPER, APPELLANT.

Filed September 22, 2020.    No. A-19-1146.

Appeal from the District Court for Cass County: MICHAEL A. SMITH, Judge. Affirmed.

Angela M. Minahan, of Reinsch, Slattery, Bear, Minahan & Prickett, P.C., L.L.O., for appellant.

John A. Kinney and Jill M. Mason, of Kinney Mason, P.C., L.L.O., for appellee.

PIRTLE, RIEDMANN, and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Nickolas J. Harper appeals from a decree of dissolution entered by the district court for Cass County, which decree dissolved his marriage to Maelyne A. Harper, divided certain marital assets and debts, awarded Maelyne sole physical custody of the parties' minor child and permitted Maelyne to move with the child to Kansas, and ordered Nickolas to pay child support. On appeal, Nickolas challenges the district court's decisions to award Maelyne physical custody of the minor child and to permit Maelyne and the child to move to Kansas. Nickolas also challenges the district court's division of certain marital assets and its calculation of his child support obligation. Finally, Nickolas argues that the district court erred in failing to find Maelyne in contempt of court. For the reasons that follow, we affirm the district court's decision in its entirety.

- 1 -

## II. BACKGROUND

Nickolas and Maelyne were married in March 2009. They have one child together, Barrett, born in 2014. After more than 9 years of marriage, Nickolas moved out of the marital home in August 2018. Maelyne subsequently filed a complaint for dissolution of marriage on September 7.

In the complaint, Maelyne sought sole custody of Barrett and requested permission to remove Barrett from Nebraska to Kansas. Nickolas filed an answer to the complaint opposing Maelyne's requests for sole custody and removal to Kansas and seeking either sole custody of Barrett for himself or joint custody.

Both Maelyne and Nickolas filed motions for temporary allowances. In her motion, Maelyne requested that she be awarded sole legal and physical custody of Barrett pending the dissolution trial. She also requested that she be permitted to move with Barrett to Kansas immediately and that the court establish child support and a temporary parenting plan. In his motion, Nickolas asked that he and Maelyne be awarded joint legal and physical custody of Barrett pending the dissolution trial. He indicated that beginning in September 2018, the parties had developed their own temporary parenting plan, which he described as "a 50/50 shared schedule." He wished this agreed upon parenting plan to continue. Nickolas also requested that the district court prohibit Maelyne from moving to Kansas with Barrett prior to the dissolution trial.

On November 27, 2018, after a hearing on the parties' motions, the district court entered a temporary order which awarded the parties joint legal and physical custody of Barrett pending the dissolution trial. Specifically, the parties were to exercise parenting time on alternating weeks, with the exchange of the child to occur at 6 p.m. every Sunday evening. The court's order acknowledged that Maelyne had been offered a job in Phillipsburg, Kansas. However, she proposed to move to Alma, Nebraska, and commute to her new job. Nickolas agreed to Maelyne moving to Alma and the district court approved of this plan. Given that Maelyne was moving to Alma, the court found that Nickolas was entitled to temporary possession of the marital home. The court ordered Nickolas to pay $1,000 per month in temporary alimony and $324 per month in temporary child support.

In January 2019, Nickolas filed a motion to amend the November 2018 temporary order. In the motion, he requested that the district court "amend" the amount of temporary alimony ordered. He also asked that the court specifically order that Barrett not attend daycare in Kansas when Maelyne exercised her parenting time. Nickolas indicated that "Temporary removal of the minor child was not granted as previously requested." The court entered an order granting Nickolas' request to amend the amount of temporary alimony ordered. The court ordered Nickolas to pay only $500 per month going forward. The court denied Nickolas' request to require Barrett to attend daycare in Nebraska. The court explained:

> The evidence is that [Maelyne] resides in Alma, Nebraska, and commutes to her employment in Phillipsburg, Kansas. The child is placed in a daycare near [Maelyne]'s place of employment while [Maelyne] is at work. In the Court's view, this is not a violation of the temporary order and parenting plan. However, for the purposes of clarification, this practice is approved.

A few weeks prior to trial, on June 5, 2019, Nickolas filed a verified application for contempt and an order to show cause. In the application, Nickolas alleged that Maelyne "has violated the temporary order of this court by removing the minor child from the State of Nebraska." Nickolas went on to assert that "[Maelyne] has never resided in the state of Nebraska and immediately moved to the State of Kansas with her boyfriend. [Maelyne] has removed the child from Nebraska during all of her parenting time with the minor child." Nickolas requested that the district court issue an order directing Maelyne to appear and show cause as to why she should not be held in contempt.

Ultimately, the district court determined to hold an evidentiary hearing on Nickolas' application for contempt in conjunction with the dissolution trial, which began on June 19, 2019. Evidence specifically related to the contempt citation was adduced first, but all of the evidence adduced at trial was considered for purposes of the contempt citation and the dissolution action. The trial spanned 3 days ending on July 10.

1. EVIDENCE REGARDING CONTEMPT ACTION

During the evidentiary hearing on Nickolas' application for contempt, Maelyne testified that she moved to her residence in Alma in December 2018. A signed copy of a lease for Maelyne's home in Alma indicates that she began renting the home on December 8. Maelyne affirmatively indicated that she keeps her things at her house in Alma. She described the layout of the house and how she had set up the furniture when she moved into the home in December. Maelyne also testified that she stays the night at her home in Alma as much as possible. Maelyne explained that, for example, during the month of December 2018, she did not stay in Alma very much because Barrett was with Nickolas for the Christmas holiday and she stayed in Phillipsburg, Kansas, with her family, in Plainville, Kansas, with her now fiance, Harrison Gilliland, and went on a vacation to Mexico.

When questioned about her relationship with Harrison, Maelyne indicated that she had met him in October 2018, approximately a month after filing the complaint for dissolution of marriage. Harrison lives in Plainville, which is about an hour away from Alma. Phillipsburg is located approximately halfway between Alma and Plainville. Maelyne admitted that because of her relationship with Harrison, she and Barrett have stayed in Plainville "on a regular basis." She further explained that they sometimes stay in Plainville during the week, but most often they go there on the weekends. And when Barrett is with Nickolas, she primarily stays in Plainville with Harrison. Maelyne also admitted that as her relationship with Harrison strengthened, she has spent more time in Plainville and less time in Alma. Harrison testified that when Maelyne has parenting time with Barrett, they spend approximately 60 percent of their time in Plainville and about 40 percent of their time in Alma. Harrison also testified that he is uncomfortable with Maelyne residing alone in Alma.

Maelyne explained that because she works in Phillipsburg, and because her family, including her mother, resides there, that she and Barrett also spend time in Phillipsburg. Maelyne indicated that even when she and Barrett stay in Alma, they often go to Phillipsburg to have breakfast with Maelyne's mother before Maelyne goes to work. Maelyne acknowledged that her bank records for the 5 months prior to trial demonstrate that while there are multiple charges from

places in Plainville, Phillipsburg, and Holdrege, Nebraska, that there are no charges from any place in Alma. Maelyne testified, "I do use cash a lot." Maelyne's mother, Debra McConnell, testified that Maelyne and Barrett sometimes stay in Alma, sometimes stay in Plainville, and spend a lot of time in Phillipsburg.

Evidence in the record reveals that Maelyne was personally served with the application for contempt and order to show cause at the Alma residence on June 16, 2019, after four prior attempts. While one sheriff's deputy indicated that the residence did not appear to be lived in, a second deputy reported that it did, in fact, look like someone lived in the residence.

Nickolas testified that on January 23, 2019, approximately a month after Maelyne reported moving to Alma, he drove to Alma to observe Maelyne's residence there. When Nickolas traveled to Alma, Barrett was in Maelyne's physical custody. Nickolas described the house in Alma as having a "pretty overgrown" yard, windows which were boarded up, and a "run down" roof. He did not observe any vehicles at the house either at that time or later in the evening when he returned. Nickolas testified that he then drove to Plainville and did observe Maelyne's vehicle at Harrison's home.

Nickolas returned to Alma on May 29, 2019. He drove by Maelyne's residence, but did not see her or her vehicle there. Nickolas then got out of his vehicle and approached the house to look inside. Through the windows, he observed some boxes stacked up inside the kitchen. He did not believe that the house had been "set up" yet and did not believe that anyone was actually living in the house. Nickolas was unable to locate Maelyne's vehicle at the Alma residence or at Harrison's residence in Plainville on May 29. However, early the next morning, Nickolas observed Maelyne to be driving her vehicle in the vicinity of Harrison's home in Plainville. Nickolas testified that Barrett uses the term "fake Alma" immediately after he returns from his time with Maelyne.

During cross-examination, Nickolas admitted that he does not know how much time Maelyne and Barrett have spent in Alma since December 2018. He acknowledged that Maelyne is a loving and nurturing mother to Barrett and that he has never missed any parenting time due to the time Maelyne has spent in Kansas.

During the contempt hearing, Nickolas called three additional witnesses to testify regarding their observations of Maelyne's residence in Alma after she reportedly had moved there in December 2018. Nickolas' father, John Harper, testified that he traveled to Alma on March 20, 2019, to "see where [his] grandson was staying." He described his observations of the house as follows:

> Probably the first, most striking was, you know, no -- no toys in the yard, in the house, boxes stacked up against -- in the kitchen against the walls. You had just a lot of tubs and boxes and things like that and not what I would deem would be a typical home that would be lived in. No TV, furniture set up, and things like that.

He further testified that he did not observe Maelyne or Barrett at the residence when he was there on the evening of March 20 or when he returned a few hours later.

A private investigator hired by Nickolas visited Maelyne's Alma residence on February 22, 2019. He testified that he did not observe any footprints or tire tracks in the area of the house, even though there was snow and mud on the ground. However, the steps and the front porch had

been cleared of snow. He also observed the interior of the home to have "miscellaneous junk" that had been "brought in, sat down, and never moved." The private investigator did report observing some toys in the front room of the residence. The exterior of the residence was "not falling apart" and there were no boarded up windows. He did not observe Maelyne or Barrett to be present at the residence during the few hours he remained there.

A second private investigator who was hired by Nickolas observed Maelyne pick up Barrett from Nickolas on Sunday, April 14, 2019. She then followed Maelyne from Nebraska to Kansas, where Maelyne stopped briefly in Phillipsburg then traveled on to Plainville. The private investigator testified that Maelyne never stopped at the residence in Alma. Instead, Maelyne and Barrett spent that Sunday night in Plainville at Harrison's home. The next day, the private investigator visited the residence in Alma. She described it as looking not "lived in." Specifically, "One of the windows was boarded up. It was kind of unkept. I mean, the TV was on the ground, lights weren't on, lamp was on the floor." The private investigator reported that she observed no toys in the house for Barrett.

The private investigator returned to Alma on April 30, 2019. The residence looked the same as it had on April 15. Later, on April 30, the investigator observed Maelyne's vehicle at Harrison's home in Plainville.

At the close of the evidence, the district court indicated it would take the contempt issue under advisement. The court also affirmatively indicated that it would consider all the evidence presented during the contempt hearing as part of the evidence related to the dissolution proceeding.

2. EVIDENCE PRESENTED DURING DISSOLUTION TRIAL

At the start of the dissolution trial, the parties represented that they had reached an agreement as to much of the division of the marital property. The parties specifically indicated that they had not agreed on the amount of home equity owed to Maelyn, the division of certain retirement accounts, and the division of certain credit card debt. By the time of trial, both Nickolas and Maelyne were requesting the court to award them joint legal custody of Barrett. However, they disputed who should be awarded physical custody.

During the trial, both Maelyne and Nickolas testified regarding their current circumstances, their relationship with Barrett, and their opinions about the other person's parenting abilities. In addition to their testimonies, each called family members and other people involved in Barrett's life to testify regarding his relationship with Maelyne and Nickolas.

Maelyne testified that she met Nickolas when she was 14 years old and started dating him when she was 19 years old. At this time, they both resided in Kansas, in the Phillipsburg area. Shortly after they began dating, Nickolas was deployed overseas as a result of his being in the military. They got engaged while Nickolas was still overseas and got married in March 2009 when Nickolas was able to return to Kansas for a brief visit. When Nickolas returned to his post overseas, he suffered a closed head injury which ultimately resulted in him being discharged from the military due to disability. Upon Nickolas' return, they stayed in various places in Kansas, where Maelyne was attending college.

In March 2013, Nickolas and Maelyne decided to move to Nebraska to be closer to his parents, who had recently relocated to Plattsmouth, Nebraska. Maelyne explained, "Nick was

extremely depressed living out at my dad's farm [in Kansas]. I thought that it was the best decision to try and move to Nebraska to get him near his family." When they arrived in Nebraska, Maelyne was offered a job as a "biller" with a medical supply company. Shortly thereafter, she graduated with a bachelor's degree in business administration and human resources. After she graduated, she was promoted to a human resources position at the same medical supply company. She worked in this position until she voluntarily left to accept a new job in Phillipsburg in December 2018. She had earned $40,000 per year, but believed there to be no opportunities for any sort of advancement.

A little over a year after Barrett was born in 2014, Nickolas attended the law enforcement academy in Grand Island for 4 months. During this time, Maelyne and Nickolas decided to move into the same neighborhood as Nickolas' parents in Plattsmouth so that Nickolas' parents could provide childcare for Barrett. When Nickolas graduated from the academy, he began working the night shift as a patrol officer for the Sarpy County Sheriff's Department. Maelyne testified that, as a result of Nickolas' schedule, she and Barrett rarely saw him. She further testified that even if Nickolas was at home with them, he was often sleep deprived and did not have any energy for Barrett. Maelyne indicated that she was Barrett's primary caregiver, including doing his night time routine and taking him to medical appointments. She also indicated that she did most of the housework, the cooking, and the management of the family's finances.

In the year leading up to her filing the complaint for dissolution of marriage in September 2018, Maelyne testified that she saw less and less of Nickolas. He started coming home much later than normal in the morning after working his night shift. In addition, he missed family pictures, was late to Barrett's first day of preschool, and on occasion could not be located when he was supposed to care for Barrett. Maelyne became aware that Nickolas was involved in an extramarital affair during the fall of 2017, however the parties continued to live together until the latter part of the summer of 2018.

After the parties' decided to separate, Maelyne decided that she wanted to return to Kansas in order to take a new job and to be closer to her extended family, including her mother, stepfather, and biological father. Maelyne's current job is at a medical supply company in Phillipsburg. She is a customer relations specialist. She earns $20 base pay per hour plus $1,265 annually for on-call pay, which means that she is making slightly more in salary than she did at her job in Nebraska. However, her new job provides for incentives, bonuses, and "full" benefits. As of the time of trial, she had not received any incentive pay or bonus. In addition, her new job is at a growing company where there is room for advancement. Maelyne testified she could be promoted to department manager or to a position in compliance auditing.

Maelyne testified that after she moved to Alma and started at her new job in Phillipsburg, her reasons for wanting to relocate to Kansas expanded. She began dating Harrison shortly after filing the complaint for dissolution of marriage, but her relationship with him further developed after her move when she was able to spend more time with him. Maelyne testified that she is now engaged to Harrison. They are planning to build a home together and have more children. Harrison is tied to Kansas, as he sells farm machinery in a family-owned business, farms, and owns cattle. Ultimately, Maelyne wishes to be a stay-at-home mother for Barrett and her future children. According to both Maelyne and Harrison, Harrison's earnings are substantial and would provide their family with financial stability.

If she is permitted to move to Kansas with Barrett, he would attend a private Catholic school in Plainville. Currently, when she and Barrett are in Plainville, they spend time at the lake, attend church with Harrison, attend local sporting events, and are involved with the fair and with an agricultural group. Harrison testified that he has a good relationship with Barrett and that Barrett currently has his own room in Harrison's house in Plainville.

Maelyne testified that even if she is allowed to relocate to Kansas with Barrett, she believes it is important to facilitate Barrett's relationship with Nickolas. She testified that Nickolas can be a good father and that he and Barrett have a bond. In addition, Barrett has a bond with his paternal grandparents who he spends a great deal of time with when he is with Nickolas. Maelyne denied speaking badly about Nickolas to Barrett.

During cross-examination, Maelyne admitted that during her marriage to Nickolas, she had struggled with anxiety. These issues were most prevalent during the time Nickolas was away from the family at the law enforcement training academy. She explained that she sought out counseling and took medication to address her feelings. At the time of the trial, Maelyne was no longer attending therapy or taking any medication. In addition, she testified that her anxiety never affected her ability to care for Barrett.

Maelyne's mother testified on her behalf. She testified that Maelyne is a great mother and that Maelyne's "whole life revolves" around Barrett. She also testified that while Nickolas is a caring father, he has always been less involved in Barrett's day-to-day life. In particular, Maelyne's mother believed that Nickolas often deferred to his own mother regarding parenting decisions. Maelyne's mother believes that Harrison is "very, very good with Barrett and Barrett really likes being with him."

Nickolas testified that he is currently employed as "road patrol" with the Sarpy County Sheriff's Office. He works the 6 p.m. to 6 a.m. shift 7 days out of every 14 days but typically would arrive at work prior to the beginning of his shift and often had to work beyond the end of the shift. Specifically, during a week, he will work Monday, Tuesday, Friday, and Saturday. The next week he will work Sunday, Wednesday, and Thursday. As a result of Nickolas' work schedule, he suffers from significant disruptions in his sleep schedule. Nickolas testified that after returning home from working the night shift, he often sleeps for only 3 or 4 hours. In addition, Nickolas still suffers from headaches as a result of the head injury he incurred in the military.

When Nickolas has to work, Barrett stays with Nickolas' mother. When Nickolas is not working, he provides "constant care" for Barrett. In fact, Nickolas testified that during the parties' marriage, he provided a significant amount of care for Barrett because of his work schedule, including attending Barrett's medical appointments. Nickolas estimated that he did 70 percent of the family's housework. On the first day of trial, Nickolas testified that Maelyne was a good mom. He further stated that he was not aware of anyone who has anything negative to say regarding Maelyne as a mother. Later in the trial, however, he described Maelyne as having anxiety issues and often feeling overwhelmed such that she would sleep a lot during the weekends rather than care for Barrett. Nickolas did ultimately indicate that he is not necessarily concerned about Barrett being in Maelyne's care and affirmed that Maelyne is a good mother.

Nickolas testified that he has an "extremely strong" bond with Barrett. He described this bond as being stronger than the bond between Maelyne and Barrett. In particular he pointed to

Barrett's not wanting to go home with Maelyne when she picked him up from his grandparents' home after work.

Nickolas admitted that in September 2017, he began having an extramarital affair with Jasmine Ortiz, whom he met at work. He also admitted that during the next year, he would spend the night with Ortiz at least two times per week, rather than go home to Maelyne and Barrett. As a result of his affair, Nickolas repeatedly lied to Maelyne about his whereabouts. Six months after the parties separated, Ortiz moved into the marital home and began living with Nickolas. Nickolas indicated that Ortiz does not provide child care for Barrett when Nickolas is working and that he had no present intent to marry her. Barrett stays with his grandparents while Nickolas is working. Nickolas provided no testimony regarding any relationship that may exist between Ortiz and Barrett. He did not call Ortiz to testify.

Nickolas is opposed to Maelyne moving to Kansas with Barrett. He questioned Maelyne's assertion that she wanted to move to Kansas in order to accept her current job. He believes that the new job is a "lateral [move] with worse hours," since Maelyne now has to work 5 days a week instead of the 4 days a week she worked at her job in Nebraska and does not earn as much money. Nickolas believed that the real reason Maelyne wanted to move to Kansas was to be closer to Harrison and to her family. He indicated his belief that Maelyne also wishes to move in order to reduce his parenting time with Barrett.

Nickolas testified that he believes Barrett's best interests would be served by awarding him sole physical custody. Nickolas submitted a proposed parenting plan wherein he suggested that Maelyne should be awarded one weekend per month of parenting time with Barrett. He indicated that the distance between Plattsmouth and Plainville was approximately 5 hours and he did not believe it to be in Barrett's best interests to travel between the parties' homes every other weekend. The parenting plan also provided Maelyne with summer parenting time on a 2-week on, 2-week off schedule. Nickolas also indicated that Maelyne could travel to the Omaha area to visit Barrett.

Nickolas testified that if he were awarded sole physical custody of Barrett, he would enroll him in a religious based preschool which he would attend Monday through Friday from 8 a.m. to noon. After preschool, Barrett would be cared for by either Nickolas or Nickolas' mother, depending on Nickolas' work schedule. Essentially, Barrett's routine would stay the same as it had been during Nickolas' every other week parenting time.

During the trial, Nickolas called members of his family to testify on his behalf. Nickolas' mother, father, and sister testified that Nickolas was a good father to Barrett and that Barrett loves his father very much. They also each testified about concerns they had as to Maelyne's parenting of Barrett. Nickolas' sister described Maelyne as not being very engaged with Barrett and as being a bad mother. Nickolas' father testified similarly. Nickolas' father and mother also testified that Barrett did not seem to have a strong bond with Maelyne and often tried to avoid going home with her. They also each had concerns that Maelyne was speaking badly about Nickolas in front of Barrett. On cross-examination Nickolas' mother testified that she was comfortable with Barrett being alone with Ortiz. When asked the reasons for her opinion, she responded "[S]he's an adult. I think most adults with children are able [sic] of taking care of children."

Nickolas also called Barrett's preschool teacher from the 2018-19 school year to testify. The teacher described Barrett as having made great improvements during the year. Specifically,

his behavior had improved, he had friends, he was happy to be there, and he was better with daily activity transitions. The teacher indicated that Barrett was always excited to see Nickolas and clearly loved him very much. The teacher also indicated that she observed "a difference between [Barrett's] interactions [with Maelyne] and [with Nickolas]," such that Barrett was never as excited to see Maelyne.

### 3. DECREE OF DISSOLUTION

On August 26, 2019, the district court entered a decree dissolving the marriage between Nickolas and Maelyne. The court awarded the parties joint legal custody of Barrett and awarded Maelyne sole physical custody. In deciding custody, the court noted its finding that "having observed the witnesses, [Maelyne] is better suited to provide a stable day-to-day routine that is conducive to the child's continuing healthy development." The court awarded Nickolas parenting time to include every other weekend from 7 p.m. on Friday to 7 p.m. on Sunday. In addition, Nickolas was to have parenting time during the summer "commencing one (1) week after the child is released from school and concluding one (1) week before the child returns to school." The court permitted Maelyne to move to Kansas with Barrett, finding that the move would be in Barrett's best interests.

In the decree, the court also ordered Nickolas to pay child support in the amount of $944 per month. The court noted that the parties had entered into a stipulation "regarding much of the property and debts at issue." As to the remaining property, the court distributed the assets and liabilities of the parties and ordered Nickolas to pay to Maelyne $28,791.75 in order to equalize the distribution of the marital estate.

The court also addressed Nickolas' application for contempt in the decree. Ultimately, the court concluded that Nickolas had not shown by clear and convincing evidence that Maelyne willfully and contemptuously violated the terms of the temporary order because the evidence demonstrated that Maelyne maintained a home in Alma and spent a considerable amount of time there. The court stated:

> [The temporary order of November 27, 2018], along with the January 31, 2019, amendment to the temporary order, only prohibit a change of residence to a location outside of the State of Nebraska. That order should not be understood to be a bar to [Maelyne] and the child staying overnight in Kansas. There is a point where the frequency of the overnight stays in Kansas would be sufficient for a finding that the Alma, Nebraska, residence is merely a ruse and that the temporary order has been willfully and contemptuously violated. The evidence does not support that finding.

The court did, however, note that Maelyne "has attempted to comply with the temporary order in only the most minimal manner."

Nickolas subsequently filed a motion to stay as it related to his parenting time with Barrett. Specifically, he requested that he be able to continue to exercise "his week on / week off parenting time" pending his appeal. The district court overruled the motion to stay.

### III. ASSIGNMENTS OF ERROR

Nickolas alleges that the district court erred in (1) awarding Maelyne physical custody of Barrett, (2) permitting Maelyne to remove Barrett from the State of Nebraska, (3) calculating his child support obligation, (4) dividing certain marital property, and (5) failing to find Maelyne in contempt of the court's temporary order prohibiting her from moving to Kansas.

### IV. STANDARD OF REVIEW

In an action for dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, and property division; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012). An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or its action is clearly against justice or conscience, reason, and evidence. *Adams v. Adams*, 13 Neb. App. 276, 691 N.W.2d 541 (2005).

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which the trial court's (1) resolution of issues of law is reviewed de novo, (2) factual findings are reviewed for clear error, and (3) determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Welch v. Peery*, 26 Neb. App. 966, 925 N.W.2d 375 (2019).

### V. ANALYSIS

#### 1. PHYSICAL CUSTODY

Nickolas alleges that the district court abused its discretion by awarding sole physical custody of Barrett to Maelyne. Specifically, Nickolas alleges that the court conflated its analyses with regard to awarding physical custody and to allowing Maelyne to remove Barrett to Kansas. He further alleges that the court erred in finding that Maelyne was Barrett's primary caregiver and in disregarding evidence that Barrett had a much stronger bond with Nickolas than he did with Maelyne. Upon our review of the evidence presented, we do not find that the district court abused its discretion in awarding Maelyne sole physical custody of Barrett.

When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best interests. *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Id*. Neb. Rev. Stat. § 43-2923 (Reissue 2016) provides:

> (6) In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

- 10 -

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

We first address Nickolas' assertion that the district court improperly conflated its decisions regarding custody of Barrett and removal to Kansas. This court has held that in cases involving an initial custody determination and a request for removal, such as the present case, a trial court should first make a custody determination, and then conduct a removal analysis. See *Rommers v. Rommers*, 22 Neb. App. 606, 858 N.W.2d 607 (2014).

In the decree, the district court specifically stated its understanding that it "must first determine the custodial issue based on the best interest of the minor child[] as opposed to focusing on the relocation of the minor child[]." The court then went on to analyze and discuss whether Nickolas or Maelyne should be awarded physical custody of Barrett. Only after the court determined that Maelyne would be "better suited" to be Barrett's custodial parent, did the court consider Maelyne's request to move to Kansas with Barrett. And, while the court noted that "many of the same considerations that led to a finding of physical custody to [Maelyne] support a finding that the quality of life of the child would be enhanced by removal to another jurisdiction," the court clearly conducted two distinct analyses as to custody and removal. Based upon the unequivocal language in the district court's decree, we do not agree with Nickolas' assertion that the district court improperly conflated its custody and removal analyses.

We now turn to Nickolas' assertions regarding the substance of the district court's decision to award sole physical custody of Barrett to Maelyne. Here, we note that Nickolas' arguments challenging the district court's custody decision are ultimately arguments about the court's credibility findings. However, as we have often stated, where the evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See, e.g., *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017).

In awarding Maelyne sole physical custody of Barrett, the district court made a specific finding that Maelyne had

been the primary caregiver for the child for the child's entire life. While [Nickolas] did play an important role, it was [Maelyne] who shouldered the primary responsibility in the

child's morning routine, preparing meals, laundering clothes, cleaning and taking the child to his medical appointments. [Maelyne] was solely responsible for the child's care while [Nickolas] was at the law enforcement academy, and her role increased when [he] began his employment with the Sarpy County Sheriff's Office.

While Nickolas asserts that the evidence presented at trial actually demonstrates that he was Barrett's primary caregiver, we find that there was sufficient evidence presented to support the district court's factual findings, especially given our deference to the trial court's decisions about witness credibility.

Maelyne specifically testified that she was Barrett's primary caregiver and that she was responsible for a vast majority of the household responsibilities, especially after Nickolas decided to become a law enforcement officer. Maelyne indicated that for the last few years of their marriage, she and Barrett rarely saw Nickolas due to his work schedule, and later, due to his relationship with Ortiz. She testified at length about various important events that Nickolas did not assist with, did not show up for, or was not on time for. Her testimony indicated that Nickolas was not very involved with her and Barrett's day-to-day life. We acknowledge that during his testimony, Nickolas presented a very different picture of his parenting role and duties during the parties' marriage. He very clearly indicated his belief that he was Barrett's primary caregiver, especially on those days when he did not have to work. Nickolas also presented evidence to suggest that Maelyne was not as involved of a parent as she made herself out to be. But Nickolas presented inconsistent testimony in this regard. At one point in the trial he testified that he stated that Maelyne was a good mother and that he was not aware of anyone who has anything negative to say about her in that role. Elsewhere, he questioned her abilities and then called on his own family as witnesses who raised similar concerns. Ultimately, the district court found that Maelyne was Barrett's primary caregiver, thus apparently crediting the testimony of Maelyne over that of Nickolas. We do not reassess the court's credibility determination here.

On appeal, Nickolas also challenges the district court's failure to consider evidence of his strong bond with Barrett in its custody determination. We note that in the decree, the court specifically iterated its finding that Nickolas "has a close and loving relationship with the child and that [he] is active and engaged when with the child." Thus, the court clearly considered Nickolas' relationship with the child in its decisionmaking. However, the court also believed that Maelyne had a strong bond with the child. The court specifically discounted Nickolas' evidence that the child did not like to spend time with Maelyne because he wanted to stay at his grandparents' house when she came to pick him up. The court stated, "The Court declines to give that evidence much weight, as there is no other evidence to evaluate the reasons for that behavior. Consequently, the evidence only leads to the conclusion that the child preferred, at that moment, to remain where he was, with no particular reason for that desire."

Ultimately, the district court found that despite both Nickolas and Maelyne sharing a strong bond with Barrett, that Maelyne was "better suited to provide a stable day-to-day routine that is conducive to the child's continuing health and development." The district court noted that joint physical custody of Barrett was no longer an option given the distance between the parties' homes and given that Barrett was nearing school age. We do not disagree with the court's conclusions in

that regard. Considering all of the evidence presented at trial, and giving deference to the district court's credibility determinations, we cannot say that the court's decision to award Maelyne sole physical custody of Barrett was an abuse of discretion.

## 2. REMOVAL TO KANSAS

In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *Daniels v. Maldonado-Morin*, 288 Neb. 240, 847 N.W.2d 79 (2014). After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Id*. The purpose of requiring a legitimate reason for leaving the state in a motion to remove a minor child to another jurisdiction is to prevent the custodial parent from relocating the child because of an ulterior motive, such as frustrating the noncustodial parent's visitation rights. *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014).

Fundamental constitutional rights underlie this framework. The custodial parent has the right to travel between states and the right to migrate, resettle, find a new job, and start a new life. *Shapiro v. Thompson*, 394 U.S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969), *overruled on other grounds, Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974). Both parents, custodial and noncustodial, have the constitutional right to the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

In his appeal, Nickolas challenges both the district court's determination that Maelyne had a legitimate reason for leaving Nebraska and its finding that the removal was in Barrett's best interests. Specifically, Nickolas argues that Maelyne's new job did not constitute a legitimate reason for moving because it "was nothing more than a lateral move that amounted to working more days a week and working on call and she earns the same amount of income as she did in Nebraska with more hours." Brief for appellant at 32. He also argues that the removal was not in Barrett's best interests because of his strong bond with the child and because of his reduced parenting time as a result of the removal.

Before initiating our analysis of the removal factors, we pause to make clear the nature of our inquiry at this juncture. As noted in the background, Maelyne moved to Alma during the pendency of this case with the approval of Nickolas. Having found no abuse of discretion in the district court's decision to grant sole physical custody of Barrett to Maelyne, the removal question before us is whether Maelyne should be allowed to remove Barrett from Alma, 60 miles south, to Plainville. The briefs submitted in this case focus on the comparative strengths and weaknesses of Plainville as compared to Plattsmouth. However, given the custody decision, Barrett will live in either Plainville or Alma. Therefore our analysis must center on those two locations.

### (a) Legitimate Reason for Leaving State

In the decree of dissolution, the district court found that Maelyne had a legitimate reason for desiring to move to Kansas. The court explained, "The evidence supports that [Maelyne]'s initial desire to move was for employment purposes. At a later time, she entered into a relationship with an individual with whom she is now engaged to be married." We find no abuse of discretion in the court's finding.

We have long held that an award of custody to a parent should not be interpreted as a sentence to immobility. See, *Daniels v. Maldonado-Morin, supra*; *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002); *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000); *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994); *Sabatka v. Sabatka*, 245 Neb. 109, 511 N.W.2d 107 (1994); *Demerath v. Demerath*, 233 Neb. 222, 444 N.W.2d 325 (1989); *Hicks v. Hicks*, 223 Neb. 189, 388 N.W.2d 510 (1986); *Vanderzee v. Vanderzee*, 221 Neb. 738, 380 N.W.2d 310 (1986); *Boll v. Boll*, 219 Neb. 486, 363 N.W.2d 542 (1985); *Gottschall v. Gottschall*, 210 Neb. 679, 316 N.W.2d 610 (1982). Both the desire to form a new family unit through remarriage and the career advancement of the parent have been found to constitute legitimate reasons for leaving the state. See *Daniels v. Maldonado-Morin*, 288 Neb. 240, 847 N.W.2d 79 (2014) (stating that absent evidence of ulterior motive, courts have held that career advancement of parent, career advancement of new spouse, and desire to form new family unit through remarriage are legitimate reasons to remove child to another jurisdiction).

Maelyne testified that she had obtained a new job in Phillipsburg, Kansas, a town which is equidistant from Plainville and Alma. While the job did not pay significantly more than her job in Omaha at the time she decided to move, Maelyne explained that the new job provided many more opportunities for advancement. In addition, she believed that the benefits provided by her new job were better than those offered at her old job. A legitimate employment opportunity may constitute a legitimate reason for removal when there is a reasonable expectation of improvement in the career or occupation of the custodial parent. See, *Rosloniec v. Rosloniec*, 18 Neb. App. 1, 773 N.W.2d 174 (2009); *Wild v. Wild*, 15 Neb. App. 717, 737 N.W.2d 882 (2007). Given Maelyne's testimony that the job in Phillipsburg provided her with opportunities for career advancement, we find that the district court did not abuse its discretion in determining that Maelyne's new job was a legitimate reason for her desire to move to Kansas.

We note that Maelyne also testified that after moving to Alma in December 2018, her relationship with Harrison had developed and they were now engaged to be married. No specific marriage date had been set presumably given the uncertainty of when a decree of dissolution would be entered. However, both Maelyne and Harrison testified that they had firm plans to marry. They had drawn up plans and engaged a contractor to build a new house in Plainville. There was evidence that Harrison was closely tied to the Plainville area as a result of his employment in farm implement sales at a family owned business and in farming and cattle ranching. We note that he also served on the board of his church and was elected to the school board. Maelyne argues that these additional factors further support her position that she had a legitimate reason to leave. We find that we need not specifically decide whether her planned marriage independently constitutes a legitimate reason to allow her move since we have already found that her employment in Phillipsburg constitutes a legitimate reason to leave Nebraska.

(b) Best Interests

After demonstrating a legitimate reason for leaving the state exists, the custodial parent must next show that it is in the child's best interests to continue living with him or her. See *Daniels v. Maldonado-Morin, supra*. The paramount consideration is whether the proposed move is in the best interests of the child. *Id*. We examine three broad considerations in determining whether

- 14 -

removal to another jurisdiction is in a child's best interests: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation arrangements. See *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000).

### (i) Each Parent's Motives

The ultimate question in evaluating the parties' motives is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). In this case, we cannot say that either party acted in bad faith or with ill motives in seeking or opposing removal.

The evidence reveals that Maelyne's primary motives in seeking removal are her desire to start a life with Harrison, whom she is engaged to be married to, and her desire to work at a job within her field which includes opportunities for advancement and growth. Maelyne's and Harrison's testimonies indicated that Maelyne will be in a better financial situation living with Harrison in Kansas than she would if she stayed living in Alma. In fact, Maelyne testified that at some point she would like to be a stay-at-home mother. Maelyne also indicated that she wishes to be closer to her mother and the rest of her extended family who live in Kansas.

Nickolas' testimony demonstrated that he opposes the removal because he wishes to preserve his current relationship with Barrett. During the pendency of the dissolution proceedings, Nickolas had parenting time with Barrett during alternating weeks. However, this level of involvement in Barrett's daily life is impossible regardless of whether Barrett lives in Alma or Plainville. While Nickolas has a valid reason for opposing the removal of Barrett from Plattsmouth, he does not have a valid reason for opposing a move from Alma to Plainville. We note that the parenting plan prepared by the district court continues to require the exchanges of Barrett to take place in Aurora, Nebraska, as was the case under the temporary order. Therefore any additional driving and travel expense due to the move must be borne by Maelyne. While Nickolas may have a legitimate motive to oppose his loss of custody, his only possible motive for opposing Barrett's removal from Alma to Plainville would be the extra time in a vehicle Barrett would experience with each visit. This factor weighs in favor of removal.

### (ii) Quality of Life

In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the

custodial parent. *Boyer v. Boyer*, 24 Neb. App. 434, 889 N.W.2d 832 (2017). This list of factors to be considered in determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children should not be misconstrued as setting out a hierarchy of factors. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id*.

Evidence presented at the dissolution trial revealed that for a majority of Barrett's life, both Maelyne and Nickolas have been involved in meeting his needs. However, the district court found that Maelyne has been Barrett's primary caregiver for his entire life:

> While [Nickolas] did play an important role, it was [Maelyne] who shouldered the primary responsibility in the child's morning routine, preparing meals, laundering clothes, cleaning and taking the child to his medical appointments. [Maelyne] was solely responsible for the child's care while [Nickolas] was at the law enforcement academy, and her role increased when [Nickolas] began his employment with the Sarpy County Sheriff's Office.

We would also note the evidence that Maelyne's role further increased when Nickolas began his affair with Ortiz. Nickolas admitted that during the affair, he often would choose to stay with Ortiz rather than go home to Maelyne and Barrett. Nickolas also apparently absented himself from family events as a result of his relationship with Ortiz.

The evidence presented at trial also revealed that as a result of Nickolas' work schedule, Maelyne is simply better suited to provide for Barrett's daily needs, especially as he nears school age and has a less flexible schedule. Although Nickolas does have seven days off of work during a 14-day period, he sleeps during the morning hours of many of those days because he worked the night before. If sole physical custody had been awarded to Nickolas, Barrett would necessarily pass back and forth from his grandparents' care to Nickolas' care given their decision not to leave Barrett home with Ortiz. Maelyne, on the other hand, is available to take Barrett to school every morning and care for Barrett every afternoon and evening after school. We have agreed with the district court that Maelyne is better suited to provide stability and routine conducive to Barrett's development in our decision affirming the district court's award of custody.

We find here that Maelyne's ability to better meet Barrett's needs would be enhanced by allowing removal from Alma to Plainville. If removal were denied, Maelyne would be required to function as a single parent to a much more significant degree. Her future husband's business, employment, and community work such as his service on the school board requires him to spend most of his time in the Plainville area. If removal were denied, Barrett would live and go to school in Alma, while his mother works in Phillipsburg and his stepfather spends his days in Plainville. Alternatively, if it were possible for Barrett to attend school in Phillipsburg, he would be commuting approximately a half hour to and from school. In this scenario Barrett's time would be divided between his residence in Alma, a secondary residence in Plainville, while possibly attending school in Phillipsburg. His emotional, physical, and developmental needs are best served by allowing removal wherein he has the opportunity to live and be educated in one community.

The third, fourth, and ninth factors are best examined together. Maelyne testified that her new job in Kansas will enhance her career because it provides opportunities for advancement. In

addition, her income will be enhanced due to her marriage to Harrison. The testimonies of both Maelyne and Harrison indicated that Harrison earns enough income as to be able to care for Maelyne and Barrett, even if Maelyne chose to be a stay-at-home mother. Maelyne and Harrison are preparing to build a new home which would be located on a lake. Such house will be an improvement from Maelyne's current house located in Alma, which is rented, small, and in need of some repairs. These factors weigh in favor of removal.

Barrett did not testify as to his living preference during the dissolution proceedings. And, in fact, he is too young to have any sort of preference about his living situation. As such, we accord no weight to this factor.

Both Maelyne and Nickolas testified regarding the religious-based preschools in Plattsmouth and Plainville that Barrett would attend if in their care. No evidence was offered with respect to educational opportunities in Alma. During the temporary period, Barrett attended a preschool in Phillipsburg during his weeks in his mother's possession. This factor must be weighed as neutral, given the lack of evidence comparing Alma's schools against those available in Plainville.

Barrett has extended family in both Nebraska and in Kansas. Nickolas' parents and his sister both live near Nickolas' residence. Barrett is particularly close to his paternal grandparents as they provided daily care for him during the parties' marriage and have continued to care for him when Nickolas has had parenting time, but has had to work. In Kansas, Barrett would reside near his maternal grandmother and grandfather and would be able to have more interactions with the rest of Maelyne's extended family who reside in Kansas. Maelyne testified that when she and Barrett resided in Alma, they would often go to her mother's house for breakfast in the morning and her mother would help care for Barrett while Maelyne was at work. Nickolas testified that he also has extended family in Kansas, including Phillipsburg. Both Alma and Plainville are close to the extended family in Kansas. Plainville is slightly farther from Plattsmouth than Alma, but Barrett's time with Nickolas and his Plattsmouth area family will not be diminished by the additional distance. This factor does not weigh for or against removal.

Finally, the evidence shows that there is a degree of hostility between the parties due to the issues present in this case. While the parties each testified to their desire to get along for Barrett's sake, the custody decision in this case has the potential to antagonize the hostilities between the parties. However, it is doubtful that the extension of that decision to allow Maelyne to move Barrett an additional 60 miles away would measurably foment that hostility. Therefore, this factor weighs slightly in favor of removal.

We do not doubt that the decision to grant sole physical custody to Maelyne may diminish the quality of the relationship between Nickolas and Barrett. It is unlikely that if Maelyne and Barrett move from Alma to Plainville, the quality of the relationship enjoyed by Nickolas and Barrett will suffer additionally however. At the time of trial, Barrett was nearing school age. Whether Maelyne lived in Alma or Plainville, it was quickly becoming impossible for Nickolas to have the amount of parenting time he was enjoying under the temporary order. The parties live some distance from each other, whether in Plainville or Alma. The court did what it could to provide Nickolas significant parenting time. This parenting time would not change based on whether Barrett lives in Plainville or Alma.

Upon our review of all the evidence presented at trial, we conclude that the quality of life factors weigh in favor of removal. This is especially true when we consider the relatively short distance between Maelyne's current home in Alma and Harrison's home in Plainville. While Maelyne is moving across the border to Kansas, Barrett will not be much further from Nickolas then he is presently.

### (iii) Impact on Noncustodial Parent's Contact With Child

The third factor in the best interests determination is the impact of the move on the contact between a child and the noncustodial parent, when viewed in light of reasonable visitation arrangements. *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008). This consideration focuses on the ability of the court to fashion a reasonable visitation schedule that will allow the noncustodial parent to maintain a meaningful parent-child relationship. *Id*. Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Id*. Of course, the frequency and the total number of days of visitation and the distance traveled and expense incurred go into the calculus of determining reasonableness. *Id*. Indications of the custodial parent's willingness to comply with a modified visitation schedule also have a place in this analysis. *Id*.

In the decree, the district court awarded Nickolas with parenting time every other weekend and during a majority of the summer months. The parenting time awarded to Nickolas in the decree certainly constitutes a decrease in his in-person contact with Barrett. During the pendency of the dissolution proceedings, Nickolas had parenting time with Barrett during alternating weeks. As such, during his weeks of parenting time, Nickolas was involved in Barrett's daily life and routines and spent time with Barrett whenever he was not working. That scenario will change regardless of whether Barrett lives in Alma or Plainville. Nickolas will no longer enjoy the same level of involvement in Barrett's daily life, except during the summer months. As previously noted, at the time of trial, Barrett was 5 years old and nearing school age. Once Barrett started attending school, the week-on-week-off temporary parenting time schedule would have had to change even if Maelyne continued to reside in Alma, given the distance between Alma and Plattsmouth. We note that Nickolas specifically testified that he agreed to Maelyne living in Alma.

Ultimately, we find that this factor weighs in favor of removal. Nickolas' parenting time with Barrett will decrease as a result of Barrett's entry into school, not the additional 60 miles between Plattsmouth and Plainville. The removal from Alma will not decrease the parenting time Nickolas will receive. Although Barrett has to travel slightly farther in order to visit Nickolas if he and Maelyne reside in Plainville, the parenting time schedule established in the decree is reasonable and appropriately fosters Nickolas and Barrett's positive relationship.

### (iv) Best Interests Conclusion

The district court did not abuse its discretion in finding that Maelyne had a legitimate basis for seeking removal of Barrett from Nebraska to Kansas due to her employment opportunity. Further, in reviewing the best interests considerations laid out above, as applied to the evidence in this case, we cannot say that the district court abused its discretion by granting Maelyne's request to remove Barrett from Nebraska to Kansas.

### 3. CHILD SUPPORT

In the decree of dissolution, the district court calculated child support using a sole custody worksheet and determined Nickolas' share of child support to be $944 per month. However, the court also ordered that Nickolas' child support obligation shall be reduced during his summer parenting time with Barrett, such that for the months of June, July, and August, Nickolas' child support obligation will be $477 per month.

On appeal, Nickolas argues that the district court should have calculated child support using a joint custody worksheet based on the number of parenting-time hours he was awarded. Nickolas explains:

> [He] was awarded every other weekend parenting time with the child, which amounts to approximately 52 days. [He] was further awarded every summer with the child starting one week after school is released for the summer recess, presumably mid-May and concluding one week prior to school returning to session, presumably mid-August, and Maelyne was awarded every other weekend during the summer months. Based upon the award of parenting time, [he] has approximately an additional 82 days of parenting time during the summer. [He] was also awarded holiday parenting time which amounts to about 12 additional days each year per the parenting schedule in the parenting plan. [He] was awarded a total of 144 days per year with the child at a minimum.

Brief for appellant at 36. Upon our review, we do not find that the district court abused its discretion in calculating child support using a sole custody worksheet.

The child support guidelines provide a rebuttable presumption that support shall be calculated using a joint custody worksheet when "a specific provision for joint physical custody is ordered and each party's parenting time exceeds 142 days per year." Neb. Ct. R. § 4-212 (rev. 2011). But, here, no specific provision of joint custody was ordered. In fact, the district court was very clear that it was awarding Maelyne sole physical custody of Barrett. Nonetheless, Nickolas argues that the district court should have deviated from the guidelines and used the joint custody worksheet because his parenting-time hours exceed 142 days per year.

Notably, Nickolas calculates his days of parenting time using approximations and estimates. We note that there was no school calendar or other evidence presented by either party which would make possible a precise calculation of the amount of summer parenting time awarded to Nickolas. There was no evidence to indicate the date Barrett's school would conclude for the summer or when it would resume in the fall. Without such evidence, we are not convinced by Nickolas' assertion that he will have 82 days of summer parenting time, particularly taking into account Maelyne's weekends. Similarly, Nickolas' approximation that he will have 12 additional days of parenting time each year due to holidays does not appear to have taken into account that Nickolas' regularly scheduled parenting time may take place during a holiday.

Ultimately, we conclude that the evidence presented at trial does not support the deviation from the child support guidelines that Nickolas suggests. There is nothing in the record which affirmatively demonstrates that Nickolas' parenting time will exceed 142 days per year. Moreover, the district court provided Nickolas with a downward deviation of his child support during the

summer months. We cannot say that the district court abused its discretion in its calculation of Nickolas' child support obligation.

4. PROPERTY DIVISION

On appeal, Nickolas challenges the district court's division of certain marital property. Before we discuss his specific assertions in this regard, we recount the law which underlies our analysis.

In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016). Equitable property division under Neb. Rev. Stat. § 42-365 (Reissue 2016) is a three-step process. *Stanosheck v. Jeanette, supra*. The first step is to classify the parties' property as marital or nonmarital. *Id*. The second step is to value the marital assets and marital liabilities of the parties. *Id*. The third step is to calculate and divide the net marital estate between the parties. *Id*. The ultimate test in determining the appropriateness of a property division is fairness and reasonableness as determined by the facts of each case. *Id*. Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006).

We note that in this case, much of the parties' marital property was distributed pursuant to a joint stipulation. Nickolas alleges that his assertions on appeal concern property that fell outside of the stipulation.

(a) $3,500 Transferred From Parties' Joint Account

During the trial, Nickolas testified that as a part of the discovery process, he learned that Maelyne had opened her own checking account in January 2018, approximately 8 months prior to the parties' separation. Maelyne did not dispute the existence of this account. Nickolas believed, that based upon bank account records, Maelyne had improperly transferred $3,500 from their joint checking account into her own checking account after they had separated. Maelyne testified that the funds she transferred out of the joint checking account and into her own account were partially a gift from her mother and partially a loan from her uncle to pay her attorney fees. She testified that the money from her relatives which was initially deposited into the joint checking account did not in any way belong to Nickolas. In the decree of dissolution, the district court did not account for the $3,500 Nickolas alleges Maelyne removed from their joint checking account. On appeal, Nickolas asserts that the court should have taken these funds into consideration when calculating the equalization payment he was ordered to make to Maelyne.

We first note that in the joint property statement, filed by the parties at the start of the dissolution trial, they indicate, "The checking and savings accounts of the parties have previously been divided." The parties then provide a list of the current accounts for each of them and an approximation of the current balance for each account. Presumably based upon the representation within the parties' joint property statement that the bank accounts were no longer an issue, the district court did not specifically value or divide the parties' bank accounts in the decree. To the

extent the district court found that the parties' had already agreed to the disposition of the accounts and the money contained therein, we cannot find an abuse of discretion.

Moreover, we note that Maelyne specifically testified that the $3,500 she moved from the joint checking account to her own checking account was not marital property as it constituted gifts from her mother and a personal loan from her uncle to pay her initial attorney fees in the dissolution proceedings. Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id*. Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id.* If the separate property remains segregated or is traceable into its product, commingling does not occur. *Id.* The burden of proof rests with the party claiming that property is nonmarital. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017).

While the bank account records submitted into evidence do not provide clear evidence regarding the origin of the funds, Maelyne specifically indicated that as soon as the money was deposited into the joint checking account, she moved it to her separate bank account. In addition, it is clear from the evidence that this money was given to Maelyne at a time when the parties were contemplating separation and were starting to divide their assets. Given Maelyne's testimony that the money was never intended to be marital property and her testimony that the money was almost immediately transferred out of the joint account, we cannot say that the district court abused its discretion in determining that she met her burden to prove the $3,500 was nonmarital. As such, we do not find that the court abused its discretion in failing to consider the $3,500 in calculating Nickolas' property equalization payment.

(b) Nickolas' Postseparation Paycheck

At trial, Nickolas testified to his belief that in early September 2018, after the parties' separation, Maelyne retained his paycheck, which totaled $1,674.80 and which was directly deposited into the parties' joint checking account. Nickolas indicated that he did not give Maelyne permission to retain these funds. To the contrary, Maelyne testified that at the time the paycheck was deposited into the joint checking account, Nickolas was still using that account and that she was continuing to use the money in the joint checking account to pay for marital expenses, including the mortgage on their home. In the decree of dissolution, the district court did not account for the September paycheck Nickolas alleges Maelyne improperly retained in their joint checking account. On appeal, Nickolas asserts that the court should have taken these funds into consideration when calculating the equalization payment he was ordered to make to Maelyne.

We cannot say that the district court abused its discretion in failing to consider the funds from the September paycheck in its division of property. Nickolas testified that he physically moved out of the parties' home in approximately August 2018. The September paycheck was directly deposited in the joint checking account shortly after Nickolas left the marital home. According to Maelyne, at the time the paycheck was deposited, both she and Nickolas were continuing to utilize the funds in the joint checking account. Maelyne also testified that these funds

were used to pay the parties' mortgage, a marital expense. Given this testimony, we cannot find that Maelyne improperly retained the funds or that Nickolas did not have ready access to the funds.

5. CONTEMPT ACTION

Finally, Nickolas alleges that the district court erred in failing to find Maelyne in contempt of the temporary order by moving to Kansas with Barrett when the dissolution proceedings were pending. Nickolas asserts:

Maelyne created a complete ruse related to her relocation to Alma, Nebraska. It is clear from the record that she threw some furnishings in a home that she claimed she rented. She never lived in that home nor did the child and the court completely abused its discretion by not finding her in contempt of the Court's temporary order. Maelyne's behavior was clearly willful and contumacious. Her testimony as well as the testimony of her significant other clearly lacks credibility.

Brief for appellant at 42. Upon our review, we do not find error in the district court's failure to find Maelyne in contempt of the temporary order.

When a party to an action fails to comply with a court order made for the benefit of the opposing party, such act is ordinarily a civil contempt, which requires willful disobedience as an essential element. *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012). "Willful" means the violation was committed intentionally, with knowledge that the act violated the court order. *Id*. Outside of statutory procedures imposing a different standard, it is the complainant's burden to prove civil contempt by clear and convincing evidence. *Id*.

In the decree of dissolution, the district court found that Maelyne "attempted to comply with the temporary order in only the most minimal manner." However, the court also found credible Maelyne's evidence that she maintained a home in Alma and spent a considerable amount of time there. The court noted that the temporary order was not meant to be a bar to Maelyne or Barrett staying overnight in Kansas. Ultimately, the court found that Maelyne and Barrett did not stay overnight in Kansas so often as to support a finding that the temporary order was willfully and contemptuously violated.

In his brief on appeal, Nickolas points to evidence he presented at the contempt hearing which suggested that Maelyne was not, in fact, residing at her Alma residence. As we stated above, the district court found Maelyne's evidence to the contrary to be credible. Again, we give the district court's credibility decisions deference because it heard and observed the witnesses. See *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). Given Maelyne's testimony about her living situation during the pendency of the dissolution proceedings, we do not find that the district court erred in failing to find Maelyne in contempt of the temporary order.

Moreover, we note that even if the district court had found Maelyne in contempt of the temporary order, by that juncture in the proceedings, there was no real sanction to be imposed upon her. The district court issued its decision as to the contempt action in the decree of dissolution. In that same decree, the court awarded Maelyne sole physical custody of Barrett and permitted her to move with him to Kansas, a decision that we have affirmed in this appeal. A civil contempt order has the purpose of compelling one party to act for the benefit of another. See, e.g., *Hossaini*

*v. Vaelizadeh, supra*. Now that Maelyne has been awarded custody of Barrett and has been granted permission to permanently move to Kansas, we cannot perceive of any action she could be compelled to take which would remedy the time she spent in Kansas while the dissolution proceedings were pending. This is especially true given that Nickolas has failed to allege or prove that he was in any way harmed by Maelyne's spending overnights in Kansas during the pendency of the proceedings. In fact, Nickolas specifically testified that he never missed any parenting time with Barrett due to Maelyne spending time in Kansas. We agree with the district court that Maelyne's compliance with the temporary order was minimal and should not be condoned. Ultimately, however, even if found in contempt, we can conceive of no coercive sanction that could have been imposed in conjunction with the decree that would have served a beneficial purpose. As such, we find no abuse of discretion in the district court's conclusion.

## VI. CONCLUSION

We find that the district court did not abuse its discretion in awarding sole physical custody of Barrett to Maelyne or in permitting Maelyne to relocate to Kansas with Barrett. We also find that the district court did not abuse its discretion in its child support calculation or in its property distribution. We affirm the district court's order which found Maelyne was not in contempt of the temporary order.

AFFIRMED.